MULLINS & KYTE *v.* ROAD IMPROVEMENT DISTRICT No. 5.

Opinion delivered February 4, 1924.

1. HIGHWAYS—ROAD IMPROVEMENT CONTRACT—CANCELLATION.— Where a contract for road construction was to be completed December 1, 1920, unless prevented by the district, by the act of God, strikes, or other causes beyond the control of the contractors," and there were no substantial differences between the original route and the route subsequently determined upon by the district, and on June 22, 1921, the contractors had put in place less than one-third of the earth required for the embankment, the commissioners were within their rights in taking over the job; the contract providing therefor in case the contractors failed to prosecute the work so as to complete it within the time specified.

2. HIGHWAYS—METHOD OF DETERMINING EXCAVATION.—Under a contract providing that the amount of material excavated will be measured in its original position by cross-sectioning, unless the engineer elects to cross-section the embankments after the material has been placed, in which event he shall provide for a shrinkage of ten per cent., *held*, where the engineer elected to cross-section the embankment, ten per cent. should be subtracted.

3. HIGHWAYS—COST OF COMPLETING CONSTRUCTION OF EMBANKMENT. —Where a road district took over a contract for road construction on account of the contractor's delay in completing the work, where the witnesses for the contractors testified that there was no substantial difference between the cost per yard of placing the earth to complete the improvement and the cost per yard of the earth which had been put in place, and the witnesses for the district testified that the expensive part of the dump consisted in putting the earth upon the higher part of the dump and finishing the work off, the latter view is more reasonable.

4. HIGHWAYS—IMPOUNDING FUNDS OF DISTRICT.—In a suit to enjoin a road improvement district from canceling a contract to construct a road and to impound the funds of the district, it was proper to refuse to impound such funds where the improvement was not completed when relief was asked.

5. HIGHWAYS—CANCELLATION OF CONTRACT—SAVING CREDITED TO CONTRACTORS.—Where, on the district taking over the construction of

a road because of the contractor's delay, a saving in the cost was properly credited to the contractors, in accordance with a provision in the contract.

6. HIGHWAYS—DELAY IN CONSTRUCTION—LIQUIDATED DAMAGES.—In a contractor's suit to enjoin a road district from canceling a contract for road construction, where defendant sought liquidated damages for delay in construction, it was not error to refuse to charge the contractors with such damages where most of the delay was caused by unprecedented rainfall and by changes in the plans.

7. COSTS—WHEN DIVIDED.—In a contractor's suit to enjoin a highway district from canceling a contract for road construction, the district having taken over the contract on account of delay in completing the road, the costs will be equally divided, in view of the fact that most of the delay was occasioned by unprecedented rainfall and by changes in the plans.

Appeal from St. Francis Chancery Court; *A. L. Hutchins,* Chancellor; affirmed.

*Coleman & Gantt,* for appellant.

The record shows that the contract was breached by the district. Such being the case, appellants are entitled to recover the amount due them for the work they had done up to the time of the breach, and also the amount they would have earned on the remaining work, had the district carried out its contract. 158 Ark. 91; 80 Ark. 228; 9 C. J. 822. Even if appellants had been responsible for the delay, the district had waived the right to declare a forfeiture on that account. 158 Ark. 91. If the language of the contract is doubtful, that construction should be adopted which will impose the least hardship upon the parties. 78 Ark. 202. And all doubts should be resolved against the party who prepared the contract— in this instance, the district. 112 Ark. 1; 115 Ark. 166. See also 88 Ark. 363; 95 Ark. 449. If the engineer thought the work was being done improperly, it was his duty to reject it at once. 200 Mich. 453; 166 N. W. 904; 90 N. W. 700. Failure to reject an obvious defect is equivalent to approval. 35 Cyc. 229; 152 N. W. 1071. It was an abuse of discretion to tax the entire costs against the appellants. 148 Ark. 181; 125 Ark. 332; 132 Ark. 606; 158 Ark. 91. Plaintiffs were entitled to an equitable

garnishment.   143 Ark. 446; 146 Ark. 494; 148 Ark. 181;
152 Ark. 422.   There was at least a substantial perform-
ance of the contract which entitled appellants to recover:
64 Ark. 34; 67 Ark. 219; 97 Ark. 278; 105 Ark. 353; 147
Ark. 203; 148 Ark. 181.   Taking charge of the road and
attempting to remedy the alleged defects constituted an
acceptance of the work.   97 Ark. 278.

*A. B. Shafer* and *Mann & Mann,* for appellees.

The engineer was made the referee in this case, and,
if he acted in good faith, his findings will not be dis-
turbed.   175 U. S. 590; 44 Law. ed. 284; 137 Fed. 369;
114 S. W. (Ark.) 242.   The evidence does not disclose
that the engineer, at any time, so acted or ruled that his
conduct amounted to fraud or bad faith.

SMITH, J.   Road Improvement District No. 5 was
organized under the Alexander road law, for the purpose
of improving several short lines of road in St. Francis
County, near Hughes.   In May, 1920, it entered into a
contract with appellants, Mullins & Kyte, for a part of
the construction work which was planned.   This contract
embraced the building of the bridges and the culverts on
the three lines of road designated as "A," "B," and
"F," and the construction of the earth embankment on
line "F," which begins about two miles north of Hughes
and extends to the Crittenden County line near Chatfield,
a distance of a little over three and one-half miles.   The
road for its entire length was along the right-of-way of
the Missouri Pacific Railroad Company.

At the time the contract was entered into it was
planned that the road should begin on the west side of
the railroad, near Hughes, and should continue on that
side for 1,622 feet, and then cross over to the east side,
along which it ran for 7,512 feet, and then crossed back
to the west side, where it continued to the Crittenden
County line.   After the contractors entered upon the
job, it was decided by the commissioners of the district
to change the location of the roads at two points, and
the contractors were so notified on the 26th day of June.

The first change was in the property of J. M. Bush, between stations of the road numbered 16 and 41, where the road crosses a small slough, and it is insisted that this change put the road on lower land, which was wetter and required a higher fill of earth. It is alleged that the center line of the second change was not located until August 18, and that no profile for the new location was ever furnished to the contractors by the engineers for the district. These changes in the route of the road constitute the chief excuses for the admitted delay in the completion of the improvement. Another excuse is that the unfavorable weather delayed the work. At any rate, only 26.22 per cent. of the work had been completed on December 1, 1920, when, according to the contract, the work should have been entirely completed. Thereafter but little work was done until June 21, 1921, when the contractors were directed to discontinue the work. The contractors immediately brought suit to enjoin the commissioners from canceling the contract, and they prayed that the funds of the district be impounded and held subject to the order of the court, and that a master be appointed to determine the amount of work done and to be done, and to state an account between the parties, if they were not allowed to complete the work.

The commissioners filed an answer, in which they denied the allegations of the complaint, and alleged breaches of the contract by the contractors in many respects; and a cross-complaint was filed in which judgment was asked for liquidated damages for failure to complete the road in the time limited, for alleged overpayments, and for improper excavations of borrow-pits, and certain other items of damage, amounting, in the aggregate, to $27,700. There was a reply to the cross-complaint, denying the damages claimed.

The cause was heard on the 14th of April, 1922, and the court made the following findings:

(1) That the contractors were not in default in failing to complete the contract by December 1, 1920, as the changes in the location of the road produced a

material change in the contract, which entitled the contractors to an extension of time.

(2)   That the district is not therefore entitled to recover liquidated damages for delay.

(3)   That the delay of the contractors thereafter in completing the road, and their failure to place adequate equipment on the work, warranted the district in taking over the work in June, 1921, and proceeding to finish it under the terms of the contract.

(4)   The contention of the district in regard to the measurement of the earth work was sustained.

(5)   A finding was made in favor of the contractors covering the issue in regard to clearing and grubbing the right-of-way.

(6)   A finding was made in favor of the contractors in regard to the retained percentage of the contract price held by the district.

(7)   That the contractors should recover $462.61 erroneously charged to them in estimate No. 17, made by the engineer of the district.

(8)   That the contractors should recover the difference between the contract price for doing the unfinished portion of the work and the reasonable cost to the district of completing the work.

(9)   That the reasonable cost to the district of the earth work remaining to be done with drag-line machines is 35 cents per cubic yard, and the reasonable cost of finishing work in the Bush fill is $1 a cubic yard, which amounts to a total for said finishing work of $1,778.70.

(10)   The court, not being sufficiently advised as to the quantities of the work remaining to be done, or as to the cost of the items thereof other than earth work as above set forth, ordered that a special master be appointed to state an account of the difference between the contract price for doing said work and the reasonable cost to the district of completing it and of the amount due them for work already done, based on the findings herein set forth.

Upon these findings the court ordered that F. H. Ford be appointed as a special master to determine the reasonable cost to the district of completing the work, and to state an account of the difference between such reasonable cost and the contract price for doing said work, and to make a finding as to the balance due the contractors.

The eighth finding of the court was based upon the 61st paragraph of the contract, which authorized the district, upon the failure of the contractors to prosecute the work with such materials and equipment as, in the opinion of the engineer, is necessary to complete the work within the time specified, to secure such additional labor, equipment and materials as may be necessary to properly proceed with the work. This section of the contract authorizes the commissioners to charge the expense thus incurred to the contractors, but further provides that, in case the expense so incurred shall be less than the sum which would have been payable under the contract, if it had been complied with by the contractors, the contractors shall be entitled to the difference; and, if more, the contractors and their sureties shall pay the excess.

On May 13, 1922, the master made a report, which was based upon testimony taken before the original submission and testimony taken by the master himself. According to the master's report, the net amount payable to the contractors was found to be $14,265.50. These figures were based upon a consideration and finding upon numerous controverted items.

The district filed fourteen exceptions to this report, which were heard and sustained by the court on the............ day of June, 1922. The report was disapproved, and leave was given to both the contractors and the district to take further evidence, and this was done.

The district employed the Morgan Engineering Company to make an estimate of the work done, and of that remaining to be done to complete the contract, and the cost thereof, and the representatives of that company

made an investigation, which was followed by an elaborate report, and the officers of that company gave testimony sustaining it in detail.

Thereafter the contractors also took additional testimony, and on November 7, 1922, the court rendered a final decree, finding that the district was indebted to the contractors in the sum of $2,015.66, with interest at six per cent. from July 18, 1921, and that plaintiffs should pay all costs of this action. Both parties excepted; the contractors perfected their appeal, and the district has cross-appealed.

It appears from the facts stated that the questions involved are chiefly questions of fact, and the testimony upon which the court made the finding appealed from is conflicting. The question is whether this finding is clearly against the preponderance of the testimony.

The contractors appear to be correct as to the time when and the circumstances under which the route was changed; but we do not think this change involved the damage, by way of delay, which the contractors claimed. A profile appears to have been furnished when the contract was originally let, and the last change was to restore this plan. Besides, the engineer for the district testified that there was no substantial difference between the two routes, as they were both parallel and adjacent to the railroad, and the proposed road ran through level country, the only difference being that the original route and the one last determined upon required, at one or two places, a slightly greater fill or embankment.

The court held, however, that because of this change in plan the contractors were not in default at the time the district notified the contractors to leave the job; but the court found that the contractors were thereafter in default, and that the directors were within their rights in taking over the job. We think the testimony supports this finding. On June 22, 1921, the contractors had put in place less than one-third the earth required in the embankment.

The testimony is quite voluminous and conflicting, and there were three hearings by the chancellor, the first on the original submission, the second on the exceptions to the master's report, and the last on the final submission, the second and third hearings being had on the additional testimony taken because of the uncertainty entertained by the chancellor about the facts. The case appears therefore to be one in which much consideration should be given to the findings of the court, and, upon a consideration of the testimony, we are unable to say that his findings, or any of them, are clearly against the preponderance of the testimony.

It is quite obvious that the finding of the court below was largely influenced by the report of the Morgan Engineering Company. This company made its examination and report after the court had heard the exceptions to the master's report, and by this time the issues of fact were sharply defined, and this report dealt directly with those issues. This report covered the amount of work remaining to be done, the condition of the completed work with respect to the specifications under which it was to be done, and, in particular, the work necessary to be done on the part of the job which the contractors claimed was complete, to bring it up to the specifications. The principal defects complained of were that the borrow-pits had been so excavated that they would not drain as the specifications required they should do, and that a sufficient berm was not left to hold the sides of the embankment.

One of the important questions of fact was how to measure the embankment or roadbed. This controversy grew out of the interpretation of paragraph 82 of the specifications, which reads as follows: "82. METHOD OF DETERMINING EXCAVATION QUANTITIES. The amount of material excavated will be measured in its original position by cross-sectioning, unless the engineer elects to cross-section the embankments after the material has been placed. In which event he shall provide for a shrinkage of ten (10%) per cent. Cross-sections will

include breakage or slides which are not due to the carelessness of the contractor and which have not been removed, also all masonry walls and stone fences. Buildings and other obstructions will not be measured, but will be included in the price bid for excavation."

Experts testified on both sides of the question. Those who testified for the contractors expressed the opinion that the language quoted meant that the ten per cent. should be added to the measurement of the roadbed, while the experts who testified for the district expressed the opinion that the ten per cent. should be subtracted. In other words, if an estimate showed that, say, a thousand yards of earth had been put in place, should a hundred yards be added or subtracted on account of shrinkage? The measurements were made while the earth was fresh and newly placed, and the court found that the ten per cent. should be subtracted. We think this finding consonant with common observation and experience that fresh earth packs and shrinks. Besides, we would so interpret the contract as a matter of law, as there appears to be no such ambiguity in the language employed as to make expert testimony necessary or competent to explain it.

The chancellor substantially accepted the report of the Morgan Engineering Company as to the amount of work done and the portion thereof remaining uncompleted. Without reciting the testimony—which would consist in setting out conflicting estimates—we announce our concurrence in the finding of the court below.

Some of the conflict in the testimony grows out of the difference of opinion as to the comparative cost of the completed and the uncompleted parts of the work. It was the theory of the witnesses for the contractors that there was no substantial difference between the cost per yard of placing the earth to complete the improvement and the cost per yard of the earth which had been put in place; whereas it was the opinion of the witnesses for the district that the expensive part of the dump con-

sisted in putting the earth upon the higher part of the dump and finishing the work off. This view appears to be the more reasonable one.

The court found—and we concur in the finding—that the contractors did not excavate the borrow-pits so that they would drain, and did not leave sufficient berm to protect the sides of the embankment, as required by the specifications. It was pointed out by the engineers who made the report for the Morgan Engineering Company that these defects could be remedied in only one of two ways, and that the cost of one method was prohibitive, and the cost of the cheaper method was given in detail. The contractors insist that they should not be charged with this cost, as they say it required them to do work not called for by the specifications. This appears to be true; but it also appears to be true that this additional work was made necessary by the failure of the contractors to observe the specifications as they proceeded with the work. Yet, as we understand the final decree, the court did not charge the contractors with the full amount of this estimate. In other words, while the court appears to have accepted, as the basis of the final decree, the report of the Morgan Engineering Company, this was not done without some exceptions, and, without further discussion of the testimony, which has been carefully considered, we announce our concurrence, at least we are unable to say that the finding is clearly against the preponderance of the evidence.

We think the court properly refused to impound the funds of the district, as the improvement had not been completed when that relief was asked. *Newell Contracting Co.* v. *Elkins,* 161 Ark. 625.

We are of the same opinion in regard to the finding on the matters involved in the cross-appeal. The commissioners took over the work under the authority of paragraph 61 of the contract, which provided, as has been stated, that, in case the expense incurred by the board should be less than the sum which would have been

payable under the contract, if it had been completed by the contractors, the contractors should be entitled to receive the difference; but, if such expense should exceed the sum which would have been payable under the contract, then the contractors and the sureties on their bond should be liable for the excess.

The court found there was a profit of ten cents per cubic yard in the unfinished embankment, and allowed the contractors credit therefor. Without setting out the conflicting testimony on this finding, we announce our conclusion that it was not clearly against the preponderance of the testimony.

The court also refused to charge any sum against the contractors by way of liquidated damages for delay. In support of the court's finding on that question it is pointed out that the contract provided for the work to be completed by December 1, "unless prevented by the district, by the act of God, strikes, or other causes beyond the control of the contractors." It is urged that the completion of the work was prevented by the district, and certainly by causes beyond the control of the contractors in the way of unprecedented rainfall, and the court found that the change in the plans excused most of the delay complained of.

The costs of the entire case were assessed against the contractors, and it is insisted that these costs should have been assessed against the district, as there was a recovery by the contractors.

Courts of equity have a discretion in the matter of taxing costs which courts of law do not have. But, upon a consideration of the whole case, we think it would be more in accord with equitable principles to divide these costs equally between the parties, and it will be so ordered. In all other respects the decree is affirmed.