## ROAD IMPROVEMENT DIST. NO. 5 OF CRITTENDEN COUNTY, ARK., v. ROACH et al.

Circuit Court of Appeals, Eighth Circuit. March 24, 1927.

Rehearing Denied May 4, 1927.

No. 7542.

**I. Appeal and error �köö842(8)—Highways ⊑⊏ 113(4)—Whether engineer's estimates are conclusive held question of law, involving construction of contract, and determination of referee or trial court is not binding on appellate court.**

Whether estimates of engineer as to amount of work done by road construction contractor are conclusive, and, if so, estimates of which engineer is solely a matter of construction of written contract, which is question of law,

on which determination of master or of trial court is not binding on appellate court.

**2. Highways ⛞113(4)—Under road construction contract, monthly estimates, including estimates by former engineer, held subject to correction on final estimate by new engineer.**

Under road construction contract, providing that engineer's determination as to amount of work done shall be conclusive, and that all estimates prior to final estimate, on which payments have been made, shall be merely partial estimates, subject to correction in the final payment, *held*, that final estimate, made by engineer employed at that time, is conclusive as to all the work, and superseded prior monthly estimates, including those made by previous engineer, in absence of fraud in changing engineers.

**3. Highways ⛞113(4)—Engineer's final estimate is not conclusive, unless plainly so expressed in contract, but, if so expressed, must be enforced, in absence of fraud or gross mistake implying bad faith.**

Engineer's final estimate of work done under road construction contract is not conclusive, unless such intention is expressed in contract in plain language; but, if so expressed, it is to be enforced, in absence of fraud or mistake so gross as necessarily to imply bad faith.

**4. Highways ⛞113(4)—Road district cannot change engineers to secure fraudulent or unfair advantage under contract making engineer's estimates final.**

Law implies that power given to any party to a contract must be honestly exercised, and road district cannot change engineers to secure a fraudulent or unfair advantage, under road construction contract making engineer's final estimate conclusive.

**5. Highways ⛞113(4)—Burden is on road construction contractor to show road district's fraud in changing engineers by overwhelming evidence.**

Burden of showing bad faith of road district in changing engineers during road construction, under contract making engineer's estimates as to amount of work done conclusive, is on contractor, and evidence of such fraud must be more than a mere preponderance; it must be overwhelming.

**6. Highways ⛞113(4)—Engineer's inexperience is no ground to disregard contract requirement making engineer's final estimate conclusive.**

Inexperience of engineer is no reason to disregard plain requirement of road construction contract that engineer's final estimate of amount of work done shall be conclusive.

**7. Highways ⛞113(4)—Evidence held to show honesty and good faith of resurvey made by engineer as basis for final estimate under road construction contract.**

In suit against road improvement district for accounting for balance due for constructing road, evidence *held* to show that resurvey as to amount of work done, made as basis for final estimate by engineer, who was made final arbiter by contract, was honest and made in good faith.

**8. Highways ⛞113(4)—Engineer's final estimate as to work done, based on combination of alternative methods prescribed in road construction contract, cannot stand.**

Where a contract requires a thing to be done in a defined manner, that procedure must be followed, unless it is impossible to do so, and engineer's final estimate of amount of work done under road construction contract, to be conclusive, as provided by contract, must be reached by methods of measurement prescribed by contract, and final estimate, based on compromise of two alternative methods prescribed, cannot stand.

**9. Highways ⛞113(4)—Road construction contract held to make 90 per cent. of volume of loose earth in embankment equivalent to 100 per cent. in "original position."**

Where road construction contract provided that amount of material excavated should be measured in its original position by cross-sectioning, unless engineer elects to cross-section embankments after material has been placed, in which event he shall provide for 10 per cent. shrinkage, *held*, that contract intended that 90 per cent. of fresh embankment could be measured as equal to 100 per cent. in "original position," which means cross-sectioning of the place from which it was excavated, in view of the added volume of loose dirt over that in place.

**10. Evidence ⛞7—It is common knowledge that loose earth occupies more space than in its natural condition.**

It is common knowledge that free or loose earth occupies more space than earth in its natural condition.

**11. Highways ⛞113(4)—On remeasurement, more than year after excavation of material placed in road embankment, held, that no deduction should be made for shrinkage under contract provision.**

Where more than a year had elapsed since materials were excavated and placed in road embankment, *held* that, on remeasurement, no subtraction should be made for shrinkage under contract provision making 90 per cent. of earth in embankment equal to 100 per cent. in original position, since undisputed evidence showed that entire shrinkage occurs in one year.

**12. Highways ⛞113(4)—Road construction contract, contemplating compensating contractor for placing dirt in embankment, held to contemplate payment for filling stump holes under road.**

Under road construction contract, which contemplated that contractor was to be compensated for all dirt put into road embankment, *held*, that contractor was entitled to compensation for filling stump holes under road, since dirt used to fill such holes was put into the embankment.

**13. Highways ⛞113(4)—Where road construction contract contemplated compensation for filling stump holes, compensation should not be denied merely because contractor believed it was payable under oral agreement outside of contract.**

Where road construction contract contemplated that contractor should be paid for filling

stump holes under road, and both parties proceeded on that theory during entire progress of work; court of equity should not deny compensation for such work merely because contractor believed that he was entitled to compensation under oral agreement outside of contract.

**14. Highways ⬳113(4)—Engineer's final estimates of quantity of material used to fill stump holes, made after fills were covered by road, cannot stand against actual measurements by former engineer.**

Final estimates as to quantity of materials used by road construction contractor in filling stump holes under road, made on resurvey by new engineer and based on theories without substantial basis of fact after fills had been covered by roadway, cannot stand, so as to supersede. actual measurements made by former engineer before holes were filled, but such actual measurements should stand, because no other can be obtained.

**15. Highways ⬳113(4)—Road construction contractor held not entitled to additional compensation for making roadway flat, instead of crowned.**

Road construction contractor *held* not entitled to additional compensation for extra dirt used in making surface of roadway flat, instead of crowned, as provided in contract.

Appeal from the District Court of the United States for the Eastern District of Arkansas; Jacob Trieber, Judge.

Suit by M. J. Roach and another, partners doing business under the firm name of Roach & Shuford, against Road Improvement District No. 5 of Crittenden County, Ark. Decree for plaintiffs, and defendant appeals. Decree in accordance with opinion.

Walter G. Riddick, of Little Rock, Ark. (A. B. Shafer, of Memphis, Tenn., and Charles T. Coleman, of Little Rock, Ark., on the brief), for appellant.

Thomas S. Buzbee, of Little Rock, Ark. (J. Merrick Moore, H. M. Trieber, George B. Pugh, and H. T. Harrison, all of Little Rock, Ark., on the brief), for appellees.

Before STONE and VAN VALKENBURGH, Circuit Judges.

STONE, Circuit Judge. Appeal from a decree, in an action for an accounting, allowing recovery against appellant for balance found due under a construction contract.

Appellees graded certain roads for appellant under a written contract. Up to January 1, 1920, I. R. Packard was engineer for appellant. He was then replaced by the Morgan Engineering Company. This action was for a balance of $40,891.22, due on work done up to January 1, 1920, and a balance of $14,312.44, for work done thereafter.

The dispute of fact was as to the amount of work done. The master found, by other evidence, that the estimates of work made by Packard of work done under him, were correct; that the estimates of work done thereafter, as made by the Morgan Engineering Company, were correct; that certain additional work had been done for which payment should be made and reported recovery for such total. The Morgan Engineering Company had made an estimate of the work done during the Packard period, which estimate was much less than the estimate of Packard and other testimony tended to show.

The first contention of appellant is that the estimate of Morgan Engineering Company as to all the work was, under the terms of the contract, binding upon appellees. The provisions of the contract thus relied on are as follows:

"Section 53. *Engineer to be Referee.* The engineer shall have full supervision over the entire work, and his decision as to quality of material, construction and rate of progress of said work and the meaning of all drawings and specifications shall be final and conclusive. He shall determine the amount and quantity of the work of the several kinds performed, materials furnished which are to be paid for under the contract, in case any question shall arise, shall be a condition precedent to the right of the contractor to receive any money due under the contract. All orders and instructions to the contractor shall be given by the engineer."

"Section 63. *Scope of Payments.* The payment of any current or final estimate or of any retained percentage shall in no way, and in no degree, prejudice or affect the obligation of the contractor, at his own cost and expense, to repair, correct, renew or replace any defects or imperfections in the construction of the roadway and its appurtenances; or in the strength of, or quality of materials used therein or thereabout, or relieve the contractor from the payment of any and all damages due or attributable to such defects; provided such defects, imperfections, or damages shall be discovered on or before the final inspection or acceptance of the road. And the findings of the board and the engineer in this respect shall be final."

"Section 65. *Approval and Final Payment.* Upon a request from the contractor for a final inspection of all work done under his contract, the engineer shall make such a final inspection of the entire roadway and upon completion of all necessary repairs or renewals he shall certify to the 'board' and the 'chairman' in writing as to said completion, and shall further certify as to the en-

tire amount of each class of work performed and as to the value thereof. The 'board' and 'chairman,' upon receipt of said certificate, shall in turn certify the aforesaid certificate or estimate to the 'treasurer' for final payment and shall notify the contractor and his surety of the acceptance of the road. The action of the 'board' and 'chairman' and engineer by which the contractor is to be bound and concluded according to the terms of the contract, shall be evidenced by the aforesaid certificate and final payment, all prior certificates or estimates upon which payments may have been made being merely partial estimates and subject to correction in the final payment."

In connection with the above provisions should be considered the provision following:

"64. *Partial Payments.* Payments will be made upon the engineer's estimate for the work done: Provided, however, that no estimate shall be made except after the first of each month during the progress of the work, and that payments will be due on such estimates on or before the tenth of the month in which the estimate is made. Estimates will be based upon the amount of work done at the time of making the estimate. Eighty-five per cent. of the amount of such estimate will be allowed the contractor, the balance to be retained by the board until the final estimate is allowed, previous estimates being deducted."

Appellant claims that the above contract provisions make the estimates made by its engineer conclusive and that the particular engineer intended is the person who happens to be such *at the time the final estimate was made.* Appellees claim that the estimates of the engineer, *at the time the particular work was done, control.*

The court overruled exceptions filed by each party to the report and decreed recovery. The master in his "Conclusions of Law" stated:

"The respective parties have cited authorities to sustain the proposition that the estimates of an engineer are, under a contract such as is involved in this case, conclusive in the absence of fraud, or gross mistake. The real point in issue is, the estimates of which engineer are to be given this binding effect? Presumably the plaintiffs contend that it is applicable to Packard but not to the Morgan Engineering Company, while the defendant contends that the rule is applicable only to the estimates of the Morgan Engineering Company. Neither position, in my judgment, can be sustained."

While the master stated that he did not agree with either contention, his determination was, in effect, to adopt the view that the estimate of the engineer at the time the work was done was controlling. Further on in his conclusions, the master states:

"At the time the contract was entered into Packard was the engineer for the district, selected by the district, and was its representative. The contract signed by the parties bears his name, and, therefore, the parties both knew at the time the contract was entered into that Packard was the engineer, and it is to him that the provisions of the contract with respect to the power of the engineer is referable. It is easy to see that a contractor might be willing to enter into a contract where Jones is the engineer, and unwilling to enter into it if Smith were the engineer. Packard, the original engineer, was discharged by the defendant without the consent, or approval, of the plaintiffs, and the defendant, arbitrarily, upon their own motion and without the consent of the plaintiffs, appointed the Morgan Engineering Company. Therefore, it is clear to my mind that the estimates of the Morgan Engineering Company would not have the finality that the estimates of the original engineer would have. This, therefore, disposes of the defendant's contention with respect to the finality and binding effect of the Morgan Engineering Company's final estimate.

"It does not, however, necessarily mean that the estimates of the Morgan Engineering Company on work done subsequent to January 1, 1920, should be disregarded. In fact I think that their estimates for that period should be accepted, for there is nothing in the evidence to show that they were incompetent, or incapable of measuring dirt as it was being put into the embankment."

It thus appears that the master concluded that the Packard estimates were binding because he was the particular individual contemplated by the parties when they made the contract, he being then the engineer for the appellant, and that he was replaced "without the consent or approval" of appellees and the Morgan Engineering Company substituted without such consent. Such reasoning is inconsistent with the acceptance of the estimates by Morgan Engineering Company covering work done after Packard was discharged, yet, such was accepted by the master. If the individual, Packard, who happened to be engineer when the contract was made was the only engineer, contemplated by the contract, whose estimates should control, obviously such provision would apply to the entire work covered by the contract.

[1, 2] Whether the estimates of any engineer are conclusive and, if so, which engineer, depend upon the provisions of the contract. Such determination is solely a matter of construction of an undisputed written contract. It is a question of law and one, as to which, this court is in no wise bound by the determination of the master or of the trial court. While the entire contract is not in the record, we assume that all parts pertinent to this controversy have been included. Paragraphs 53, 64 and 65 of the contract, quoted above, determine the character and effect of the estimates made by the engineer. Paragraph 64 provides for monthly estimates, payment thereunder and retention of 15 per cent. of such monthly payment "until the final estimate is allowed." Paragraph 65 provides for the final estimate. It requires the engineer to make and certify in writing to the "board" and "chairman" of the board of the district "the entire amount of each class of work performed and as to the value thereof." This certificate is to be made upon request of the contractor and is to cover "all work done under his contract." Upon receipt of such certificate, the board and the chairman "in turn certify the aforesaid certificate or estimate to the 'treasurer' for final payment." The paragraph then concludes with the significant and controlling sentence following:

"The action of the 'board' and 'chairman' and engineer by which the contractor is to be bound and concluded according to the terms of the contract, shall be evidenced by the aforesaid certificate and final payment, all prior certificates or estimates upon which payments may have been made being merely partial estimates and subject to correction in the final payment."

The "terms of the contract," as used in this sentence, certainly include paragraph 53, which make the determination of the engineer binding on the contractor as to the "amount and quantity of the work of the several kinds performed * * * which are to be paid for under the contract" and a "condition precedent to the right of the contractor to receive any money due under the contract." It is clear that the proper construction of these provisions in the contract is that the final estimate is the only estimate, by the contract, made binding and conclusive upon the contractor. This last quoted sentence clearly means (1) that the final estimate is to conclude and replace the monthly estimates and (2) that it alone is to be such action as, under the contract, is to bind the contractor and that it is to have that effect.

[3] Such a provision in a contract of this character is not to be construed as making such estimate final unless such intention of the parties is expressed in "plain language" (Mercantile Trust Co. v. Hensey, 205 U. S. 298, 309, 27 S. Ct. 535, 51 L. Ed. 811, 10 Ann. Cas. 572; United States v. Hurley, 182 F. 776, 778, this court), but where such meaning is thus clearly expressed, it is to be enforced (Mercantile Trust Co. v. Hensey, 205 U. S. 298, 309, 27 S. Ct. 535, 51 L. Ed. 811, 10 Ann. Cas. 572; United States v. Gleason, 175 U. S. 588, 602, 20 S. Ct. 228, 44 L. Ed. 284; Sheffield & Birmingham C. I. & Ry. Co. v. Gordon, 151 U. S. 285, 292, 14 S. Ct. 343, 38 L. Ed. 164; Chicago, Santa Fé & Cal. R. R. Co. v. Price, 138 U. S. 185, 193, 11 S. Ct. 290, 34 L. Ed. 917; M. & P. R. R. Co. v. March, 114 U. S. 549, 5 S. Ct. 1035, 29 L. Ed. 255; Sweeney v. United States, 109 U. S. 618, 3 S. Ct. 344, 27 L. Ed. 1053; Kihlberg v. United States, 97 U. S. 398, 24 L. Ed. 1106; and the following cases in this court: A. R. Young Constr. Co. v. Road Improv. Dist., 297 F. 127, 137; Frisco Lumber Co. v. Hodge, 218 F. 778, 780; United States v. Hurley, 182 F. 776; Choctaw & M. R. Co. v. Newton, 140 F. 225; Guild v. Andrews [C. C. A.] 137 F. 369). The rule is concisely stated in the Gleason Case, supra, at page 602 (20 S. Ct. 233), as follows:

"Another rule is, that it is competent for parties to a contract, of the nature of the present one, to make it a term of the contract that the decision of an engineer, or other officer, of all or specified matters of dispute that may arise during the execution of the work shall be final and conclusive, and that, in the absence of fraud or of mistake so gross as to necessarily imply bad faith, such decision will not be subjected to the revisory power of the courts."

[4] Therefore, we must conclude that the appellees are bound, through their expressed consent in the contract, by the estimates as to quantity made in the final estimate. The contention that the appellant could not rely upon this estimate as having such force unless it be made by the engineer who was such when the contract was made is unsound. Such contention would rest necessarily upon some provision of the contract. There is no provision in the contract which in any wise limits the power or right of appellant to change engineers, at will. Of course, the law always requires honest dealing, and, to secure such, would imply that a power given to any party to a contract must be honestly exercised. Therefore, it would be implied in a contract of this character that a change of

engineers should not be to secure a fraudulent or unfair advantage. But the evidence is clear that the reason for the change of engineers here was that appellant thought Packard incompetent, and because he would not give the board members information concerning the work, and there is no evidence to show that such was not the real reason for the change. Therefore, the final estimate made by the engineer at that time (Morgan Engineering Company) is the estimate which must, under the contract, control.

As quoted above from United States v. Gleason; 175 U. S. 588, 602, 20 S. Ct. 228, 44 L. Ed. 284, the rule is that such an estimate can be overthrown only because of "fraud or of mistake so gross as to necessarily imply bad faith." In Guild v. Andrews, 137 F. 369, 371, Judge (now Justice) Van Devanter, speaking for this court, expressed the same rule as "in the absence of fraud or such gross mistakes as imply bad faith or a failure to exercise an honest judgment." Further, on the same page, he defines these terms as follows:

"Good faith, which is presumed in the absence of clear and convincing evidence to the contrary, renders the action of the arbiter final and conclusive. Bad faith renders it of no effect. Gross mistakes imply bad faith only when, all the circumstances duly considered, they cannot be reconciled with good faith, and then they not only imply, but necessarily imply, bad faith."

[5] The burden of showing such fraud or bad faith is upon the contractor and the evidence of such must be more than a mere preponderance, it must be "overwhelming." Choctaw & M. R. Co. v. Newton, 140 F. 225, 233, 234 (this court).

[6, 7] There was no finding by the master or the court as to fraud or bad faith on the part of the Morgan Engineering Company in making the estimate on the work done while Packard was engineer. The effect of the master's finding is that the engineer who acted for the Morgan Engineering Company was young and inexperienced and used a wrong method of computation. "Inexperience" of the engineer is no reason to disregard the plain mandate of the contract. Young Construction Co. v. Road Improv. Dist., 297 F. 127, 137 (this court). The evidence was in direct conflict as to whether the method employed was likely to secure just results. There was not one word of evidence even hinting bad faith. In fact, the evidence is positive to the contrary. When the Morgan Engineering Company was ready to begin this estimate of the work done under Packard, it explained the purpose of the resurvey to the contractors and invited them to cooperate therewith, but they refused. Also, when the result of the resurvey was reached, the Engineering Company advised Packard thereof "and requested him to go over the matter with us to see if the discrepancy could be reconciled." The contractors were also invited to examine the records of the resurvey. When the contractors later employed an outside engineer (Miller) to check over the work done under Packard, he was advised by the Engineering Company that it had resurveyed such work and "they offered to furnish me anything that I wanted from that resurvey." But the contractors would have nothing to do with the resurvey while it was being done; Packard would not accept the invitation to reconcile his results with those secured on this resurvey; and the outside engineer (Miller) made no use of the records of that resurvey thus freely extended to him because he did not approve of the method used and it is undisputed that this engineer stated, also, that he would not check the data of the resurvey as the contractors "did not wish to proceed in that manner." This outside engineer, who was evidently an honest man, testified that "Mr. Sayford [vice president of the Morgan Engineering Company] and I could have gotten together on this matter as far as the engineering end of it is concerned, but Mr. Roach [one of the contractors] didn't care to do that." Also, this engineer stating, in speaking of the work done on the resurvey:

"I assume that his work in the field is correct. I don't think there is any question about that. We just differ as to the method employed.

"If that method had been pursued immediately after the dump had been put up the result would have been absolutely correct."

The field notes made by Packard were never available to the Engineering Company but were, apparently, made so to the contractors and Miller testified that "not having the original notes the Morgan Engineering Company was compelled to adopt some such method as they did." Packard was not put on the stand and his absence not explained. The result of the testimony is that the honesty and good faith of the resurvey is beyond question. In fact, we can properly quote and apply here a sentence from the opinion of this court in Choctaw & M. R. Co. v. Newton, 140 F. 225, 234, substituting the present outside engineer, Miller, for the one, Reaugh, in that case, as follows:

"It is difficult for the impartial mind to

read the conflicting testimony of witnesses on many of the controverted matters on which the master made an adverse finding on the final estimates of the engineer without the conviction that the conclusion was reached by resolving too many reasonable doubts against the engineer, and accepting as his mentor and guide the testimony and conclusions of the witness Reaugh [Miller here], who was the selected expert of the contractors to go over this work after it was practically completed, and to review the final estimates of the engineer."

The master and the court have evidently thought that the contractor should have received more than the resurvey accorded him and that such resurvey was inaccurate. Thus, they have been led aside by a laudable desire to see justice done between these parties but justice is here done by and only by enforcing, as far as can be done, the contract which the parties themselves made. The contractor agreed to be bound by the final estimates of the engineer at the time such final estimates were made. Having thus chosen the arbiter and legally obligated himself to abide by his decision and having utterly failed to show that such decision was not honestly sought and reached, he must abide the result, if that result be arrived at in accordance with any method provided in the contract.

[8] But that result must be reached by the methods of measurement required by the contract. Paragraph 82 of the contract is as follows:

"*Method of Determining Excavation Quantities.* The amount of material excavated will be measured in its original position by cross-sectioning unless the engineer elects to cross-section the embankments after the material has been placed. In which event he shall provide for shrinkage of ten (10%) per cent. Cross-sections will include breakage or slides which are not due to the carelessness of the contractor and which have not been removed, also all masonry, walls, and stone fences. Buildings and other obstructions will not be measured, but will be included in the price bid for excavation."

This paragraph provides two methods of measurement of the dirt excavated: "In its original position" or in the embankment. The former method is to be used unless the engineer elects to use the latter. These methods are in the alternative. The method used by the Morgan Engineering Company was a combination of these two methods, the result being reached by taking both measurements in the same cross-section and taking one-half of the figures thus obtained. The

company was actuated by a laudable intention and it may be, considering that the measurements were made some months after the earth had been placed in embankment, that such method would have produced a fairer result than either of the two prescribed by the contract. But, where a contract requires a thing to be done in a defined manner, that procedure must be followed unless it is impossible to do so.

Here, the weight of evidence seems to be that this embankment or the borrow pits (representing the earth "in original position") could have been measured separately at the time the company undertook to do so. That was not done. The engineer then in charge testified that the procedure was as follows:

"There was no measurements of the borrow pits as such nor of the embankment as such. The measurements were made of both combined, that is cross-sections were taken clear across the road and the borrow pits. The only platting of the borrow pits was done here in the office from my notes."

Had the measurements been made separately as to embankment or as to borrow pits, it would be possible to adopt the figures from either and to reach a conclusion according with the requirements of the contract. Because this was not done and such conclusion is impossible, this final estimate cannot stand as it was not made in accordance with the contract.

[9] The use of the embankment measurement involves another consideration. The contract provides that if the embankment measurement is used, the engineer "shall provide for shrinkage of ten (10%) per cent." Under this provision, the master found there should be an allowance to the contractor for 10 per cent. in addition to the quantity measured in the embankment. This was erroneous. This exact provision was construed and this question determined by the Supreme Court of Arkansas in Mullins & Kyte v. Road Improv. Dist., 162 Ark. 427, 434, 258 S. W. 639, 642, where the court said:

"One of the important questions of fact was how to measure the embankment or road-bed. This controversy grew out of the interpretation of paragraph 82 of the specifications, which reads as follows: '82. *Method of Determining Excavation Quantities.* The amount of material excavated will be measured in its original position by cross-sectioning, unless the engineer elects to cross-section the embankments after the material has been placed. In which event he shall provide for a shrinkage of ten (10%) per cent. Cross-sections will include breakage or slides

which are not due to the carelessness of the contractor and which have not been removed, also all masonry walls and stone fences. Buildings and other obstructions will not be measured, but will be included in the price bid for excavation."

"Experts testified on both sides of the question. Those who testified for the contractors expressed the opinion that language quoted meant that the 10 per cent. should be added to the measurement of the roadbed, while the experts who testified for the district expressed the opinion that the 10 per cent. should be subtracted. In other words, if an estimate showed that, say, a thousand yards of earth had been put in place, should a hundred yards be added or subtracted on account of shrinkage? The measurements were made while the earth was fresh and newly placed, and the court found that the 10 per cent. should be subtracted. We think this finding consonant with common observation and experience that fresh earth packs and shrinks. Besides, we would so interpret the contract as a matter of law, as there appears to be no such ambiguity in the language employed as to make expert testimony necessary or competent to explain it."

[10] It is clear that this is the proper construction of that provision in the contract. The contract prefers measurement of the dirt "in its original position" which means cross-sectioning of the place from which it was excavated. The measurement was to be based on the compact earth. It is common knowledge that free or loose earth occupies more space than in its natural condition. When the parties permitted a second method of measurement (in embankment) they intended that such method should have the same results as though the earth had been measured in accordance with the preferred method. The expectation, but not the necessary requirement, certainly was that the embankment would be measured while new and unsettled. The ten per cent. difference was to take care of the added volume of the loose dirt over that in place. The parties agreed that 90 per cent. in fresh embankment would be measured as equal to 100 per cent. in "original position." Such is the proper construction of the contract.

[11] Applying that construction to the conditions at the time the company made these measurements, however, it is evident that no such deduction should be made. The sole basis of this deduction was that the earth in the embankment would occupy more space than "in place." As the earth in embankment settled into place and became solid this difference would gradually diminish to the point of disappearance when fully settled. The undisputed evidence is that it requires about one year for such complete settlement. That year has now more than elapsed. On a remeasurement no subtraction should be made for shrinkage because the entire shrinkage has actually occurred.

[12] There are two other items in dispute which require attention. One of these is an allowance for filling stump holes under the embankment. The contention of appellant is that the contract did not provide for such an allowance; that the contract was written and could not be varied by parole. The contention of appellees is that:

"The contract was not changed in any way, but there was an outside agreement by which we were to be paid for stump holes. This agreement was made just before we signed up the written contract. No written memorandum or writing was ever made with regard to it. The outside agreement was made, I think, the very day we signed the contract. I don't think there is anything in the written agreement which obligated the district to pay us for stumpage. My claim for stump holes is based wholly upon the outside agreement, a kind of gentleman's agreement.

"When the original contract was signed, Mr. Cushman, myself and Mr. Shuford were just outside the door of the room in which the board, its engineer and attorney were discussing the contract and we heard Mr. Packard, the engineer say, 'We will pay them stump hole measurements,' and he did.

"Clause 68 of the contract reads as follows: 'The surface of the ground is to be cleared the entire width of the right of way, unless otherwise specified or directed, of all brush, trees, logs or other perishable material which is to be removed or burned as the engineer may direct. All roots, stumps and shrubs must be removed to a depth of at least two feet below the finished roadway. Under embankments of more than two feet the stumps may be cut close to the surface of the ground. Ditches and drains shall be grubbed whenever in the opinion of the engineer it is necessary. The removing of weeds, grass and like vegetable growth will not be considered as clearing or grubbing and must be done at the expense of the contract.' "

[13, 14] The portion of the contract just quoted from the testimony of one of the appellees apparently reveals no obligation to remove roots or stumps except "to a depth of at least two feet below the finished roadway." It permits cutting, "close to the surface of the ground," of stumps under

embankments of more than two feet. Even if the contract required all stumps under the embankment to be removed, yet, it negatives any thought that such stump holes were to be filled without compensation. The tenor of the contract is that the contractor was to be paid for all dirt put into the embankment. Dirt to fill such holes would be put into the embankment. If the measurement of quantities had been of dirt "in original position" it would, necessarily have included that used to fill stump holes because such dirt would come from "original position." If the measurement were of embankment, such would not show any dirt used in filling stump holes and the witnesses agree that the stump hole fills could not possibly be measured after the embankment was up. It would seem clear, therefore, that the contract did include and contemplate pay for such fills. The situation is not affected by the thought of the contractors that such was not included in the contract but done under a verbal agreement. This is true because both parties proceeded under the theory that such fills were to be paid for at the regular contract price for excavation and measurements were made and allowances paid for stump hole fills during the entire progress of the work. Where such a course of conduct was mutually observed and followed and where it was authorized by the contract, a court of equity should not deny the recovery accorded by the contract simply because one of the parties conceived such recovery should be rested on some other legal basis. We think a stumpage recovery should be allowed. The evidence, even for appellant, is that at the time the remeasurement was made (the embankment being in place) it was impossible to measure the stump fill because the only method assuring anything approaching accuracy was to measure each stump hole before it was filled. The engineer made certain estimates based on theories which were clearly without any real substantial basis of fact. It is clear that these estimates were honest endeavors to reach a result made unattainable by the conditions at the time they were made. The facts were buried beyond resurrection in the embankment. While no imputation of actual fraud upon the contractor can possibly be entertained in connection with these estimates, the evidence is clear that they were no measure of the facts and to allow them to stand would work a legal fraud upon the appellees. There is positive, undisputed evidence that these actual measurements of the stump holes were made, before being filled, by Packard or that he accepted measurements so made by the contractor or subcontractors. While the result of these measurements seems large, yet, the engineer who personally conducted the resurvey stated that much of this embankment was through "heavily timbered country." Faced with this practical situation, we think these final estimates as to stump hole fills, made by the Morgan Engineering Company, cannot stand; that it is impossible now to ascertain these fills in any manner and that the quantities shown in the alleged actual measurements under Packard should stand because and as being all that is or can be obtained.

[15] The second matter relates to the surface of the embankment. Appellees contended and the master found that the contract provided for a crown surface sloping to either side from the center of the roadway and that the engineer required a change necessitating building up the sides to a flat surface with the center, thus involving placement of that much additional earth in the embankment; and that this extra dirt should be paid for. While there is a conflict in the evidence, yet, the weight thereof seems against the fact that the surface was so built up—certainly it was not done uniformly. Moreover, the remeasurement took the entire embankment and the borrow pits so that it included the surface whether crowned or flat. If a new measurement were taken it would be of the actual embankment, including all earth therein. In either case, any extra dirt placed in the embankment to level the surface would be included. The evidence supports no further, separate allowance for such and it should not be given.

## Summary.

It has been difficult to cling closely to the contract (which must govern the rights of the parties) and to work out equity to both parties under the circumstances present and controlling any solution. The situation is as follows: the evidence casts very grave doubt upon the Packard estimates; the contract gives the final estimate controlling effect over the appellees and the Packard estimates; the appellant acted in good faith in its change of engineers and seems justified in making that change; the new engineer proceeded in good faith to remeasure this disputed work; this remeasurement failed to follow the methods of measurement prescribed by the contract; this remeasurement seems to have been made in a manner which would prevent the data secured thereby from being accommodated to either of the two methods prescribed by the

contract, so that no result can be calculated therefrom which would accord with the contract methods; a remeasurement hereafter might, in the nature of things, involve changes in condition to some detriment to the appellees; the stumpage allowance is proper and the result found by the original estimate should be accepted from the necessity of the situation because the reestimate thereof is confessedly made at a time and under conditions which made it impossible to more than guess at the result; an extra, separate allowance for alleged change in the surface should not be made. The result which must be obtained is to give the appellant the contract advantage of a final estimate and to give the appellees the contract advantage of payment for the stump hole fills. Although not made in the manner required by the contract, there is a final estimate with which appellant seems satisfied as to the main result. That result includes an erroneous statement as to stump hole fills. On the other hand, the appellees are faced with possible losses through a remeasurement hereafter but that is the only way in which the appellant can be given its full, clear contract rights of a final estimate and it has proceeded promptly and honestly in all of its acts in connection with these estimates and there is, because of this contract right and proper action thereunder, less reason for subjecting the appellees to a possible injustice from such remeasurement than for subjecting appellant to an injustice through the estimates of Packard, shown by the evidence to be dubious.

Considering this entire situation, it would seem that the solution now possible which would nearest approach justice between the parties and the preservation of their contract rights would be as follows:

If the appellees prefer to avoid any disadvantages of a remeasurement (made by one of the methods prescribed by the contract) they may accept the results of the existing measurement made by the Morgan Engineering Company as modified by the original stump hole allowance. If they do not wish to do this, there should be such remeasurement to which should be added the above stump hole allowance in the manner and to the extent hereinafter set out.

It may be well to apply the first plan, suggested above, concretely so that there may be no misunderstanding of the result and effect of such choice by the appellees. There are two periods covered by the report of the master: Up to January 1, 1920, when Packard was replaced; and from that date to the end of the work, during which

period the Morgan Engineering Company was engineer. There is no challenge of the allowances (found by the master) for work during the latter period which consisted of three items of $9,597.55, $3,500, and $16,476.51—totaling $29,574.06. The dispute relates to the Packard period. As to that period, the final estimate of the Morgan Engineering Company was for $105,639.10, made up of five items. Four of such items $21,600, $789.30, $3,260.40, and $1,059.15, totaling $26,708.85, are not involved. The involved item is $78,950.25, which is for excavation of 175,445 cubic yards at 45 cents per yard. This amount of yardage was reached in the following manner: The resurvey revealed 166,010 cubic yards, which was the result of cross-sectioning both the embankment and the pits and dividing by two. This yardage included one-half of the stump hole fills (whatever the amount thereof might be) because the pit measurements included all of that yardage, the embankment measurement included none of such yardage and the above total yardage (166,010) was the dividend from dividing the combined pit and embankment yardage by two. The remaining 9,435 cubic yards to make up the total (175,445) upon which payment was calculated was for the other half of the stump hole fill which was based on assumptions which have been disapproved above. The total stump hole fill shown by the measurements on the Packard estimates (adopted as the proper basis in this opinion above) was 27,462 (actually 27,461.8) cubic yards. This is made up of three items on the September 1, 1919, estimate (Exhibit C-3) of 7,745.2, 3,045, and 5,074.6, totaling 15,864.8 cubic yards; of five items on the November 1, 1919, estimate (Exhibit C-5) of 1,944.3, 1,207.7, 1,900.8, 1,819, and 2,289.3; totaling 9,161.1 cubic yards; and two items on the December 31, 1919, estimate (Exhibit C-7) of 1,835.9 and 600, totaling 2,435.9. As one-half of the stump fill is included in the 166,010 cubic yards, there should be added thereto one-half of 27,462 cubic yards, or 13,731 cubic yards, making a total excavation allowance during the Packard period of 179,741 cubic yards, which, at 45 cents per cubic yard, is $80,883.45.

The entire net result is as follows:

Packard period:

| | |
|---|---|
| Excavation .................... | $ 80,883.45 |
| Other items.................... | 26,708.85 |
| Morgan Engineering period....... | 29,574.06 |
| Total ..................... | $137,166.36 |
| Payments made................. | 145,835.52 |
| Overpayment ................... | $ 8,669.16 |

The last above amount (subject to mathematical errors) is the amount which should be repaid to appellant by appellees if they elect to avoid a remeasurement hereafter.

If appellees decline such election, appellant may have the work, done under Packard, remeasured by the Morgan Engineering Company. Such remeasurement should be made of the embankment because the evidence shows the influences of nature upon the excavation pits would make measurement of the embankment the fairer method at this time. To the result of such measurement should be added 27,462 cubic yards for stump fills. The total, thus secured, to be taken as the amount 'of excavation to be paid for. Other items, as set forth in this opinion, to be added thereto.

### Conclusion.

The order is that appellees be allowed, within thirty days after the mandate hereon is received by the trial court, to pay into court the overpayment for the use of appellant, the trial court then to enter a decree for such sum. If such payment be not so made, the present decree to be then set aside and further proceedings ordered in accordance with this opinion. In either case, the costs in the trial court and upon this appeal to be equally divided between the parties.