Charles F. EHRLE, Plaintiff-Respondent,

v.

BANK BUILDING & EQUIPMENT COR-PORATION OF AMERICA, a corporation, Defendant-Appellant.

No. 36356.

Missouri Court of Appeals, St. Louis District, Division Three.

Nov. 25, 1975.

Armstrong, Teasdale, Kramer & Vaughan, Fred Leicht, Jr., St. Louis, for defendant-appellant.

Deeba, DeStefano, Sauter & Herd, James J. Sauter, St. Louis, for plaintiff-respondent.

McMILLIAN, Judge.

Defendant, Bank Building and Equipment Corporation of America (Bank Building), appeals from a declaratory judgment and award of damages entered by the St. Louis City Circuit Court in which the court found that Bank Building had wrongfully excluded plaintiff, Charles Ehrle, from participation in its Disability Program. Plaintiff was awarded damages in the sum of $46,091.44, including prejudgment interest. This core issue for us to resolve is whether or not plaintiff's acceptance of benefits under Bank Building's Pension Plan precluded his recovery under its Disability Program. We find, as did the trial court, that the Disability Program supplements and complements the company's pension trust plan and accordingly affirm the judgment of the trial court.

From the evidence the court could have reasonably found that plaintiff, age 63, had been employed by Bank Building for forty-two (42) years and that as a salaried employee he was covered by both the company pension plan and Disability Program. In 1960 plaintiff suffered an acute myocardial infarction and as a result thereof his health progressively declined and affected his work performance. The uncontroverted evidence shows that in July, 1967, the date his physician, Dr. Flavan, advised him to stop work, plaintiff was permanently incapable of engaging in any work or occupation which would be considered reasonable by virtue of his education, training and experience.

Because of plaintiff's health and his inability to properly supervise his department, the company lost money on two projects. Mr. William Cann, the president of Bank Building and a member of the Board of Directors, and Mr. L. J. Orabka, Chairman of the Board, knowing of plaintiff's health condition, discussed the monetary losses and management problems and concluded that management was not receiving the proper attention.

Shortly thereafter in May, 1967, plaintiff, at the request of Mr. Orabka, was asked, because of health reasons, to consider an early retirement. Mr. Orabka expressed to plaintiff that his health prevented him from carrying out his duties. After some discussion with his wife and Dr. Flavan, plaintiff personally delivered a letter dated May 29, 1967, to Mr. Orabka. The substance of the letter was that due to his physical condition he was requesting early retirement effective July 31, 1967. Mr. Orabka informed him as to the monetary amount of the pension he would receive; told him also that he would always be eligible for total disability if Social Security would accept it, and in order for Social Security to accept it, plaintiff would have to have a letter from his doctor. After an inquiry as to whether plaintiff could get such a letter, Mr. Orabka told plaintiff that when you get Social Security approval and the doctor's letter to come back to see him and there would be no problem. The trial court found that plaintiff considered the above discussion to be his application for benefits under Bank Building's Disability Program for Salaried

and Commissioned Employees—at no time during this conversation did Mr. Orabka request that plaintiff fill out and file a written application for benefits under the Disability Program. In fact, from Mr. Cann's testimony it is questionable whether the company had any formal application to be used to apply for benefits under the Disability Program.

The minutes of the Board of Director's meeting on May 25, 1967, show that by reason of ill health, at the request of the Board, plaintiff was retired on the accelerated pension plan pursuant to § 4.02(B). Section 4.02(B) provided, in part, that if the company determines that a member under the Pension Plan is physically, mentally, or otherwise incapable of performing his duties after he is sixty (60) years of age and has at least twenty (20) years of service, the member could be given an accelerated retirement. In addition, § 4.02(B) provided a method of computing the monetary amount of the pension, and that the company's determination of incapacity was final.

On July 31, 1967, under the accelerated retirement provision of the pension trust, plaintiff began to receive $760.25 per month for life with sixty (60) payments guaranteed. On January 1, 1972, the amount of the pension increased by one-third to $1,013.00.

Subsequently plaintiff satisfied the Social Security Administration of his total disability by submitting to it the proper forms from his doctor after the required six (6) month waiting period. On May 27, 1968, the Social Security Board awarded plaintiff disability benefits up to the age of sixty-five (65). Additionally, plaintiff was also awarded back disability payments from August, 1967.

After having obtained the necessary documents from the Social Security Board, pursuant to his earlier meeting with Mr. Orabka, plaintiff took these documents to him to process his disability claim. When they discovered that the documents were incomplete, Mr. Orabka said that he would look into the matter and that plaintiff would hear from him.

On June 10, 1968, plaintiff furnished Mr. Orabka with the missing additional documents. Mr. Orabka responded that the Board had chosen to grant plaintiff an accelerated retirement rather than the early retirement which he had requested; that the company's Disability Program did not apply to plaintiff and consequently plaintiff's benefits were limited to the Pension Plan and Social Security.

A brochure distributed to Bank Building's employees described the purpose of the Disability Program as follows:

"If you are disabled, you may qualify for *other company-supported benefits, such as your Bank Building Pension,* social security, state disability benefits, or workmen's compensation. . . .

"The purpose of our Bank Building Disability Program is to guarantee you a steady income that can be determined in advance." (Emphasis supplied.)

To be eligible for benefits under the Disability Program, one had to be (1) either compensated on a salaried basis or paid on a commission basis with a drawing account; (2) permanently disabled while an employee and by virtue of the disability be rendered incapable of engaging in any work or occupation which would be considered reasonable by virtue of one's training, education, and experience; and (3) apply for all other benefits to which one may be entitled with the proviso that failure to do so would forfeit all rights under the Disability Program.

Neither plaintiff nor Dr. Flavan was present at the trial of this cause, the latter because he was out of state at the time of trial and the former because he was advised by his physician not to appear. The testimony of both individuals was presented to the court by deposition. Mr. Orabka did not testify and was not present at the trial. In addition to the above recited facts, the following evidence was adduced at trial: (1) The uncontroverted testimony of Dr. Fla-

van was to the effect that based on reasonable medical certainty, plaintiff was completely disabled and was incapable of engaging in his occupation at the time of his retirement; (2) Mr. Ehrle testified that he was offered a job similar to his former position by the Bank of St. Louis in November or December of 1967 but he declined to accept the position because of his health; (3) Mr. Cann, president of Bank Building, testified that Mr. Ehrle was present when the Management Committee discussed the purpose of the Disability Program, which was "to establish a degree of payment to employees that were ill and disabled beyond a normal type of salary program." The beneficiaries of the program were to be employees of the company who were either temporarily disabled for short or long terms, or permanently disabled; (4) The Disability Program was discontinued by Bank Building on April 1, 1969. The program was replaced by a new disability plan which required the payment of insurance premiums for those employees covered by the plan. The parties agreed by stipulation to exclude the new plan from the court's consideration; (5) On May 1, 1974, Count II was submitted under a stipulation of facts. Plaintiff computed the amount of disability benefits to which he would be entitled if he were found eligible under the defendant's Disability Program. The amount of benefits through March, 1974, was computed to be $35,490.70, together with prejudgment interest of $10,600.74; (6) Defendant submitted a similar computation of benefits which was considerably less than plaintiff's computation for the reason that it credited plaintiff's "full pay" from 1965 through July 31, 1967, as a set-off against the benefits accruing to plaintiff through March, 1974. The amount of benefits thus computed was $7,815.59.

"Count II of cause was argued and sumitted (sic) on the 31st day of May, 1974 on Stipulation of Facts filed with the Court under date of May 1, 1974. Court, being fully advised, orders, adjudges and decrees judgment in favor of the Plaintiff and against the Defendant, Bank Building and Equipment Corporation of America, in the sum of $35,490.70 with interest of $10,600.74 to March 31, 1974 and cost of court."

On this appeal, Bank Building contends that the trial court erred in entering the declaratory judgment in favor of plaintiff because: (1) Plaintiff's acceptance of full pay for half-time work for over six (6) months indicated that he had elected a non-disability retirement instead of claiming disability benefits under the Disability Program, thus waiving any rights he may have otherwise asserted under the Disability Program; (2) The Disability Program was applicable only to employees prior to retirement and plaintiff did not retire in reliance on or contingent upon receiving disability benefits; and (3) Bank Building had the right to determine conclusively whether an employee is entitled to benefits under the Disability Program, and the trial court had no basis for substituting its judgment for that of the company in ruling that plaintiff was permanently disabled within the meaning of the disability plan, without the company having made any determination in regard to his physical condition.

Bank Building also contends that the trial court erred in its award of damages under Count II of plaintiff's petition because: (1) Bank Building had the right to terminate the Disability Program at any time, which it did on April 1, 1969, and there was no basis for allowing a recovery of benefits pursuant to the company's new disability plan; (2) There was no basis for finding that plaintiff was permanently disabled as of the exact date of his retirement, especially without giving the company credit for full-pay benefits during the period Mr. Ehrle worked part-time; (3) No former employee receives both a full pension and additional payments under the Disability Program, and there is no contractual basis for allowing plaintiff to receive benefits from both plans; and (4) Since the Disability Program was terminated in April, 1969, this was not a case in which liquidated damages

could be calculated and therefore, the trial court erred in awarding prejudgment interest on the judgment of damages.

■ This is a court-tried case. In such a proceeding, we review the cause de novo both upon the law and the evidence, but we must give due deference to the opportunity of the trial court to judge the credibility of witnesses. Rule 73.01(3), V.A.M.R.; *Pope v. Pope*, 520 S.W.2d 634, 636 (Mo.App.1975). Since most of the evidence in this case, however, was presented in the form of documents and depositions, we note that the rule of deference is of limited application. *In re Estate of Wintermann*, 492 S.W.2d 763, 767 (Mo.1973) and *Pashalian v. Big–4 Chevrolet*, 348 S.W.2d 628, 632 (Mo.App. 1961). In any event, we shall not set aside the judgment of the trial court unless it is clearly erroneous. *R. L. S. v. J. E. S.*, 522 S.W.2d 5, 6–7 (Mo.App.1975).

■ Bank Building's first contention is that by accepting full pay for less than full-time work and by electing a non-disability retirement, plaintiff waived his rights under the Disability Program. "Waiver" is an intentional relinquishment of a known right, on the question of which the intention of the party charged with waiver is controlling and, if not shown by express declarations but implied by conduct, there must be a clear, unequivocal and decisive act of the party showing such purpose, and so consistent with the intention to waive that no other reasonable explanation is possible. *Bartleman v. Humphrey*, 441 S.W.2d 335, 343 (Mo.1969) and *Aetna Cas. and Surety Co. v. Traders National Bank and Trust Co.*, 514 S.W.2d 860, 865 (Mo.App. 1974).

■ The uncontroverted evidence was that plaintiff's reduced work time with full pay was "With everyone's knowledge." No one at Bank Building told him, nor was there any condition in the Disability Program, that such conduct would preclude his eligibility for disability benefits. Implicit in the trial court's findings was that plain-

tiff's discussion regarding disability benefits with Mr. Orabka was an oral application for benefits under the Disability Program.

■ Bank Building makes the blanket assumption that "[o]nce [plaintiff] elected to retire on a non-disability basis, and once he accepted the company's offer of greater pension benefits than he would have automatically been entitled to, he was precluded from subsequently claiming that his alleged disability, for purposes of the income [Disability] program for employees was retroactive." A careful reading of the provisions of the Pension Trust indicates that plaintiff's "Accelerated Retirement" was neither elected nor non-disability in nature. Section 4.02(B) of the Pension Trust provides that:

> "*If the Company determines* that a member is physically, mentally, or otherwise incapable of performing his duties after he is age sixty (60) or older and has at least twenty (20) years of credited service, *he shall be retired. . . .*" (Emphasis supplied.)

Section 10.03 of the Pension Trust providing for computation and election of the disability benefit provides that:

> "[A] disabled employee who qualifies for accelerated retirement . . . shall . . . receive the amount computed . . . as though he had been retired by the Company pursuant to section 4.02B."

These two sections when read together clearly demonstrate (1) that an employee may not "elect" to retire under Section 4.02(B) since such a determination is at the discretion of Bank Building; (2) that § 4.02 is applicable to the retirement of disabled employees since a disabled employee who qualifies, but is not retired by the company under the accelerated retirement provision of § 4.02(B), will nevertheless receive the same benefits as if he had been retired under that section; and (3) Section 4.02

differs from § 10.03 only in regard to the requirement of proof of disability. Section 4.02 does not require proof of an employee's disability. Rather, it is the company which decides whether the employee is "physically, mentally, or otherwise incapable of performing his duties." If the company declines to retire an employee under § 4.02(B), the employee may still receive the same benefits as though he were retired under that section if he is at least sixty (60) years old and has twenty (20) years of credited service as required by § 4.02(B) and, pursuant to § 10.02, he is certified to be totally and permanently disabled by two duly licensed physicians.

If the substance of Bank Building's argument is accepted, a disabled employee, who could otherwise qualify for a disability pension upon proper certification and hence would also be entitled to benefits under the Disability Program, could be arbitrarily denied eligibility under the Disability Program whenever the company chose to retire him under § 4.02(B). We do not believe that the provisions of either the Pension Trust or the Disability Program place such unlimited and capricious discretion in the hands of the company. Consequently, we do not believe that it can be argued that plaintiff *elected* a *non-disability* retirement. If Bank Building had not chosen to retire him under § 4.02(B), plaintiff, who was then sixty-three (63) years of age and had over forty (40) years of credited service, could have voluntarily retired and, upon proof of a permanent disability, would have received the same benefits pursuant to § 10.03. The company's decision to retire plaintiff under § 4.02(B) obviated the need for him to furnish proof of a total disability in accordance with § 10.02. In this regard, Bank Building argues:

> "[T]he trial court chose to discount the generous granting of an accelerated pension to Mr. Ehrle, ruling incorrectly that Mr. Ehrle would automatically be adjudicated to be permanently and totally disabled under the pension plan since he

subsequently had been ruled disabled under the Social Security Act."

Section 10.01 of the Pension Plan provides:

> ". . . The term 'total and permanent disability' . . . shall be deemed to exist if (a) the member is certified in accordance with Section 10.02A as having incurred a total and permanent disability as defined under the Federal Social Security Act. . . ."

In addition, § 10.02A requires that an employee must be certified to be totally and permanently disabled by two duly licensed and practicing physicians, one to be selected by the company and the other to be selected by the employee. If the two physicians fail to agree, a third physician is selected by them, and the determination of any two of the three physicians is final and controlling on the issue of the employee's disability. The gist of appellant's argument is that the trial court neglected to consider this section because a determination of disability by the Social Security Administration is not sufficient to constitute "total and permanent disability" within the meaning of the Pension Trust absent a certification pursuant to § 10.02.

■ Again, we note that the company's decision to retire plaintiff under § 4.02B rendered unnecessary the requirement that he be certified to be totally and permanently disabled. We have the view that the trial court's finding that plaintiff "would have qualified for disability benefits under the Pension Plan" if he had not been retired by the company under § 4.02B is merely a reference to the likelihood that Mr. Ehrle would have been certified had not the necessity of certification been obviated by Bank Building's determination to retire him pursuant to § 4.02B. Even assuming arguendo that the company's characterization of this finding by the trial court is correct, such a finding was not a necessary element of the trial court's final judgment. The ultimate issue was plaintiff's eligibility for benefits under the Disability Program, not under the Pension Trust. In any event, it is

well-settled that the judgment of the trial court, even if based on an incorrect theory, should be affirmed, if, on the evidence, such a result could properly have been reached, *Godsy v. Godsy,* 504 S.W.2d 209, 211 (Mo. App.1973), and this rule is equally applicable to the correct result in a declaratory judgment action. *Dill v. Poindexter Tile Company,* 451 S.W.2d 365, 370 (Mo.App. 1970).

In sum, since it is the company and not the employee which "elects" retirement under § 4.02B of the Pension Trust, since plaintiff attempted to apply for disability benefits under the Disability Program with Mr. Orabka prior to his retirement and since there is nothing to preclude eligibility for such benefits because plaintiff worked part-time for full pay, we are unconvinced that plaintiff waived his rights under the Disability Program by receiving pension benefits under § 4.02B. Mr. Ehrle's conduct was not so consistent with the intention to waive benefits under the Disability Program that no other reasonable explanation was possible. *Bartleman v. Humphrey,* supra.

Finally, we note that Bank Building neither pleaded nor argued the "waiver" contention in the trial of this cause. Waiver is an affirmative defense which if not pleaded, presented or passed on in the trial court, cannot be presented for the first time on appeal. *Gross v. Merchants-Produce Bank,* 390 S.W.2d 591, 594 (Mo.App.1965). See also *Illinois State Bank of Quincy v. Pedersen,* 350 S.W.2d 102, 110 (Mo.App. 1961). For all these reasons, we rule this point against Bank Building.

Bank Building next argues that the Disability Program was applicable only to employees prior to retirement. Plaintiff did not retire in reliance on receiving disability benefits and no alleged statements by Mr. Orabka could alter the terms of the Disability Program which was established gratuitously.

The uncontroverted evidence at trial was that plaintiff was permanently disabled at the time of his retirement in July, 1967. His retirement was in fact necessitated by his progressively worsening physical condition. The fact that Mr. Orabka suggested that his early retirement would be on the basis of "health" further strengthens this conclusion. It would be difficult to contend that plaintiff was not entitled to benefits under the Disability Program because he retired after becoming permanently disabled and was thus no longer an "employee" within the meaning of the Disability Program. The evidence further shows that he discussed his eligibility under the Disability Program with Mr. Orabka prior to the effective date of his retirement. Plaintiff considered this discussion to be his application for benefits under the program.

We agree with the company that the Disability Program is a gratuitous private plan which is noncontributory. For such plans to become enforceable contracts, there must be notification to and knowledge of benefits on the part of the employee and consideration or continuance of employment in reliance on the plan. *Hinkeldey v. Cities Service Oil Co.,* 470 S.W.2d 494, 502 (Mo.1971); *Molumby v. Shapleigh Hardware Co.,* 395 S.W.2d 221, 226 (Mo. App.1965). The disability plan became effective on January 1, 1967, several months prior to plaintiff's retirement. Plaintiff was on the Management Committee which reviewed and adopted the plan. Hence, he was certainly aware of the nature of the plan and its benefits, and we are unwilling to conclude that he did not continue his employment from January 1, 1967, until the date of his retirement in reliance on the plan, especially since he was aware from consulting Dr. Flavan that his physical condition was eventually likely to render him unable to perform his duties with Bank Building. The fact that plaintiff discussed disability benefits with Mr. Orabka prior to his retirement is additional evidence of his reliance on the plan. Hence, if plaintiff complied with the terms and conditions of the Disability Program, a binding contract

existed. *Geiwitz v. Geiwitz,* 473 S.W.2d 781, 784–5 (Mo.App.1971) and 56 C.J.S. Master-Servant § 169, p. 828 (1948).

■ The company argues that there is no basis in logic or fact for construing plaintiff's conversation with Mr. Orabka as an oral application for benefits under the disability plan. On the contrary, the evidence is entirely consistent with such a finding. At the time plaintiff submitted his letter of resignation, Mr. Orabka told him to obtain a letter from his doctor to the effect that he was disabled, to make an application for Social Security disability benefits, and to "come and see me, because then there will be no problem." Section 5.02 of the Disability Program requires that an eligible employee must apply for all other benefits to which he may be entitled (e. g., Social Security and the Bank Building Pension Plan) or else forfeit all rights to benefits under the Disability Program.[1] Accordingly, plaintiff followed Mr. Orabka's instructions. Admittedly, the Social Security award was not presented to Mr. Orabka by plaintiff until early June of 1968, but this was because Dr. Flavan was required to wait six (6) months before submitting proof of his disability. Once the Social Security award was processed, it was back-dated effective as of the time of plaintiff's retirement. When the necessary documents were presented to Mr. Orabka, plaintiff was told that "he was going to have to look into it and . . . that I would hear from him. . . ."[2]

Subsequently, Mr. Orabka informed Mr. Ehrle that he was ineligible for benefits because the Disability Program was applicable to "disabled employees prior to, but not after, their retirement."

Bank Building argues that Mr. Orabka never presented plaintiff with any type of written application for the Disability Program, and Mr. Orabka ". . . could not deviate from the requirement of an appropriate application by Mr. Ehrle and a ruling of eligibility under the terms of the disability program."

■ It is firmly established that the terms of a plan formulated by an employer in behalf of his employees, even if gratuitously instituted, are to be taken most strongly against the employer. *Hinkeldey v. Cities Service Oil Co.,* supra; and *Connell v. United States Steel Corp.,* 371 F.Supp. 991, 1001 (N.D.Ala.1974); *Smith v. Union Carbide Corp.,* 231 F.Supp. 980, 985 (E.D. Tenn.1964) rev'd on other grounds 350 F.2d 258 (6th Cir. 1965); cases cited in 56 C.J.S. Master-Servant § 169, p. 829 (1948). First, there is no provision in the Disability Program which requires a formal written application. Indeed, Mr. Cann, the president of Bank Building and a member of the Board of Directors, testified that he was not aware if there was an application form for the program. Secondly, the Disability Program does not have a provision requiring mandatory certification of disabled employees as does the Pension Trust. Rather, § 2.01 of the Disability Program provides: "An Employee claiming any right to benefits hereunder must submit to such medical examinations and complete and furnish such forms and reports from time to time *as may be requested by the Company.* . ." (Emphasis added.)

We find nothing in the Disability Program which would preclude plaintiff from submitting an oral application for benefits

---

1. The reason for this is that under Art. IV of the Disability Plan pertaining to computation of benefits, an employee's benefits are computed at a percentage of his base pay and reduced proportionately by the amount of his "other benefits" as defined by § 1.09.

2. This tends to belie the company's argument that the initial discussion in May, 1967, was more consistent with the theory that Mr. Orabka "was hinting that a disabili-

ty pension might be granted, after the six months waiting period." By June 1968, Mr. Ehrle was already receiving pension benefits. His discussion with Mr. Orabka regarded the processing of his disability claim "in accordance with our agreement." Mr. Orabka did not dispute that such a prior "agreement" existed but rather, simply stated he would "have to look into it."

to Mr. Orabka.[3] Mr. Orabka was then the Chief Executive Officer and Chairman of the Board of Bank Building as well as a member of the Executive Committee which had sole jurisdiction over the Disability Program. The uncontroverted evidence was that plaintiff applied for benefits to Mr. Orabka prior to his retirement at a time when he was still an "employee" within the meaning of § 1.05 of the Disability Program and, pursuant to § 5.02, he applied for and received all other benefits to which he was entitled. Mr. Ehrle did not submit to any additional medical examinations or furnish any forms or reports because none were requested by the company. To be sure, the reason for this was that the company determined that he was ineligible for benefits. However, plaintiff testified that he stands ready to fill out any formal application and to submit to a medical examination by any physician which Bank Building may choose. The Disability Program contains no other conditions as a prerequisite to eligibility thereunder.

 Although the evidence regarding plaintiff's application for disability benefits prior to his retirement come entirely from his own testimony, only he and Mr. Orabka were present at the time that this discussion took place. Mr. Orabka was not present at trial, and Bank Building offered no excuse for his absence. The failure of a party to call a witness within his power who has knowledge of facts and circumstances vitally affecting the issues on trial raises a strong presumption that the testimony of such witness would have been unfavorable and damaging to the party who fails to proffer the same.[4] *Bean v. Riddle,* 423 S.W.2d 709, 720 (Mo.1968) and *Spaeth v. Larkin,* 325 S.W.2d 767, 772 (Mo.1959).

 On the basis of this evidence, we conclude that the trial court could have properly found that (1) plaintiff's continued employment after January 1, 1967, the effective date of the Disability Program and his compliance with all the requisite conditions of the program constituted a binding contract which was enforceable against Bank Building, notwithstanding that the program was instituted gratuitously; (2) plaintiff applied for benefits under the program prior to his retirement from Bank Building; and (3) in construing the provisions of the Disability Program most strongly against Bank Building, there is nothing in the program which would preclude plaintiff's oral application for benefits. We find no merit in the company's arguments to the contrary.

Bank Building next contends that "[u]nder the disability program, the company has the conclusive right to determine whether an employee is entitled to a benefit . . . and without any allegations, evidence, or findings of bad faith . . . the trial court had no basis for substituting its judgment for that of the company in determining not only that [plaintiff] should receive both disability and pension benefits, but ruling in the first instance that Mr. Ehrle was permanently disabled within the meaning of the disability program, without

---

3. The cases cited by Bank Building for the proposition that oral representations cannot alter the purpose of a written plan or program are distinguishable from the facts of the case at bar. In *Lee v. Jenkins Bros.,* 268 F.2d 357 (2d Cir. 1959), and *Burns v. Lewis-Howe Co.,* 266 S.W.2d 14 (Mo.App.1954), the alleged oral representations by the employer were directly contrary to the express terms of the plan or agreement in question. See also *Schneider v. McKesson & Robbins, Inc.,* 254 F.2d 827 (2d Cir. 1958).

4. This presumption is limited in that no inference may be drawn on account of the nonproduction of witnesses whose evidence is equally available to both parties. *Lyons v. Taylor,* 333 S.W.2d 346, 357 (Mo.App. 1960). However, "available" does not mean accessible for service of compulsory process but depends, inter alia, on the relationship borne by the witness to the particular party as would make it natural to expect him to favor one party against the other. Hence, the general rule is that an employee of one party is not equally available to the opposing party. *Bartlett v. Cain,* 366 S.W.2d 491 (Mo.App.1963). Mr. Orabka was, of course, an employee of Bank Building at the time that these events took place.

the company having made any determination whatsoever. . . ."

Section 1.11 of the Disability Program defines permanent disability as:

"Disablement extending beyond a period of twenty-four (24) consecutive months which, except for rehabilitation purposes, renders an Employee incapable of engaging in any work or occupation which would be considered reasonable by virtue of his education, training, and experience."

Section 2.01 Determination of Disability provides, in part:

"The Company shall have the right to determine *conclusively* whether an Employee is entitled to a benefit under this program." (Emphasis added.)

Section 5.01 Administration provides:

"The Executive Committee shall have sole jurisdiction over this program and may delegate to other Company officials such powers, rights, and duties as it may deem advisable."

■■■■■ In construing similar general language, the courts have held that provisions such as §§ 2.01 and 5.01 of the disability plan do not authorize the fraudulent or arbitrary withholding of payments by the employer, *Geiwitz v. Geiwitz*, supra, nor do such provisions accord complete and unbridled discretion in the employer. *Marsh v. Greyhound Lines, Inc.*, 488 F.2d 278, 280 (5th Cir. 1974).

■■■■■ The test to be applied in circumstances where the employer has summarily denied an employee's eligibility under a voluntary plan is " 'whether the Trustees have acted arbitrarily, capriciously or in bad faith; that is, is the decision of the Trustees supported by substantial evidence or have they made an erroneous decision on a question of law?' " *Connell v. United States Steel Corp.*, supra; *Hayes v. Morse*, 347 F.Supp. 1081, 1086 (E.D.Mo.1972) and *Danti v. Lewis*, 114 U.S.App.D.C. 105, 312 F.2d 345, 348 (1962). Applying this test to the instant facts, it is readily apparent that Bank Building's determination that plaintiff was not an "employee" within the meaning of the Disability Program was unsupported by substantial evidence and was erroneous. It hardly bears repeating that the uncontroverted evidence at trial indicated that plaintiff was an employee at the time that he applied for benefits under the Disability Program. There was no requirement of a written application. The fact that Mr. Ehrle did not supply Mr. Orabka with certain necessary documents until June, 1968, a date subsequent to his retirement, does not affect this conclusion. Bank Building's characterization of the June, 1968, meeting as a belated attempt by Mr. Ehrle to apply for disability benefits is thus erroneous on a question of law and the trial court properly found that the company's determination of plaintiff's ineligibility under the program was without justification.

The more difficult issue presented, however, is whether after the trial court found that plaintiff was eligible, it could then substitute its judgment for that of Bank Building on the question of whether plaintiff was permanently disabled within the meaning of the Disability Program.

■■■■ The case law in this area is not well developed. The authority which exists states that a trial court should take a very cautious approach in substituting its judgment for that of the employer, where, as here, it appears that the employer has not decided the employee's claim on its merits. *Matthews v. Swift & Co.*, 465 F.2d 814 (5th Cir. 1974) and *Boyd v. Fraser*, 382 F.Supp. 418 (E.D.Mich.1974).

■■■■ Before the trial court's discretion may be substituted for that of the employer, the employee " 'has the burden of providing such a clear case of permanent disability that no honest tribunal could reach any other decision and the burden of proving that any other decision is or would be arbitrary, fraudulent, or in bad faith.' " *Matthews v. Swift & Co.*, supra, at 821 and *Boyd v. Fraser*, supra, at 420. The evidence

needed to sustain such a burden " 'must be more than a mere preponderance, it must be overwhelming.' " *Menke v. Thompson*, 140 F.2d 786, 791 (8th Cir. 1944), quoting *Road Improvement Dist. No. 5 of Crittenden County, Ark. v. Roach*, 18 F.2d 755, 760 (8th Cir. 1927).

■ Upon a careful consideration of all the evidence, we conclude that plaintiff has satisfied this heavy burden of proof and that the trial court did not err in finding that he was permanently disabled within the meaning of § 1.11 of the Disability Program which defines permanent disability as a "[d]isablement . . . which . . . renders an Employee incapable of engaging in any work or occupation which would be considered reasonable by virtue of his education, training, and experience."[5]

The uncontroverted evidence at trial indicated that plaintiff offered overwhelming proof of his permanent disability. Dr. Flavan, an experienced cardiovascular specialist, testified that plaintiff was permanently and totally disabled at the time of his retirement—Mr. Orabka requested that plaintiff retire on the basis of "health." Thereafter, plaintiff was retired upon the company's determination under § 4.02B of the Pension Trust that he was "physically, mentally or otherwise incapable of performing his duties." Subsequently, the Social Security Administration found him permanently disabled and commenced paying benefits to plaintiff retroactive to the date of his retirement. In late 1967, plaintiff was offered a job by the Bank of St. Louis, which was similar to his position with Bank Building, but he declined the offer because of his health. Bank Building offered no evidence that plaintiff was not permanently disabled at the time of his retirement.

■ Therefore, even though the company had the right to determine conclusively that plaintiff was permanently disabled within the meaning of the Disability Program, we are convinced under all these circumstances that any other decision by it would have been arbitrary. We thus hold that the trial court did not err in substituting its discretion for that of Bank Building on the question of plaintiff's permanent disability.

■ Bank Building contends that the trial court erred in calculating the benefits due plaintiff under the Disability Program because it reserved the right to cancel the program at any time and it was canceled effective April 1, 1969. When plaintiff continued his employment in reliance on the program and subsequently fulfilled all its requisite conditions, a binding contract came into existence which was enforceable by him against Bank Building. *Geiwitz v. Geiwitz*, supra, at 784–5. See also *Hurd v. Ill. Bell Telephone Co.*, 234 F.2d 942, 946 (7th Cir. 1956). Once an employee has complied with all the conditions for entitlement to benefits from a noncontributory plan, his rights thereto become vested and his employer cannot deprive the employee of his benefits under a provision authorizing the employer to terminate the plan for any reason. *Molumby v. Shapleigh Hardware Co.*, supra, at 227; Annot., Construction of Provision Authorizing Employer to Terminate or Modify Plan, 46 A.L.R.3d 464, 468–70 (1972). Thus we find no merit to this point.

---

5. Our courts have long held that the term "total and permanent disability" in an insurance policy is not to be given a strict and literal construction, but rather is given a liberal construction. *Rose v. Nat. Lead Co.*, Mo.App., 94 S.W.2d 1047, 1052 (1936).

"[It is not necessary] that the insured be absolutely helpless or be inert or bed-ridden or house confined, but it is sufficient if it be shown that the infirmity renders the person unable to perform, in the usual and customary way, substantially all of the material acts of any occupation which his age, training, experience, education and physical condition would fit him for except for the infirmity." *Stout v. Central Nat. Life Ins. Co.*, 522 S.W.2d 124, 129 (Mo.App.1975).

Although the Disability Program is not an insurance policy, it is analogous to an insurance contract in that its provisions are construed most strongly against the employer. See *Hinkeldey v. Cities Service Oil Co.*, supra.

The company next argues that the trial court had no basis for finding that plaintiff was disabled as of the exact date of his voluntary retirement, especially without giving it credit for Mr. Ehrle's full pay during the period that he worked part-time. We disagree. The evidence clearly showed that plaintiff was permanently disabled at the time of his retirement. There is no requirement in the Disability Program, as Bank Building contends, that benefits are not to be awarded until proof of the disability is made. In any event, we note that it was the company's responsibility to request proof of disability and its failure to do so cannot impinge on plaintiff's vested right to benefits. To conclude otherwise, Bank Building could escape liability for benefits under the Disability Program by simply never requesting that applicants of the program furnish proof of their disabilities.

Similarly, we can perceive of no justifiable reason for crediting plaintiff's full-pay against the benefits due him under the disability plan. Admittedly, he worked less than full time shortly before his retirement without a salary cut, but this was with "everyone's knowledge." The company's contention in this regard is that if the court had a right to find that Mr. Ehrle was disabled as of the date of his retirement, it was obligated to consider that he was just as disabled during the period in which he worked less than full-time. First, there was no evidence presented that Mr. Ehrle was permanently disabled during this period. On the contrary, although his state of health was admittedly precarious, plaintiff did perform his duties for Bank Building until the date of his retirement. The term "permanent disability" does not contemplate the continued performance of substantially all of the duties of one's occupation. *Stout v. Central Nat. Life Ins. Co.,* supra. Secondly, if the trial court would have been obligated to find that plaintiff was disabled at some point prior to his retirement, plaintiff would have then been entitled to receive additional benefits under the Disability Program during that period.

Hence, plaintiff's full pay might properly have been deducted from the benefits due him prior to his retirement, but there would certainly be no basis for such a deduction from benefits following his retirement, since he no longer received a salary from Bank Building.

The company's next contention is that no former employee receives both a full pension and benefits under the Disability Program, and that there is no contractual basis for allowing plaintiff to recover benefits under both plans. We rule this point against the company for two reasons. First, the nature of benefits received by other former employees of Bank Building is totally irrelevant to the disposition of this cause. Second, we glean from this contention that no *retiree* ("former employee") has received a pension and then successfully applied for benefits under the Disability Program. This is essentially the same argument raised by Bank Building on the merits of the declaratory judgment. We have already held that the trial court was correct in finding that plaintiff was eligible under the disability plan. There appears to be no reason to further lengthen an already protracted opinion by further discussing this contention.

The company's final contention is that the trial court erred in awarding prejudgment interest on the amount of damages because "this was not a case in which liquidated damages could be calculated. . . ."

An amount is sufficiently liquidated for the purpose of allowing prejudgment interest thereon if the amount is readily ascertainable by computation or by determination according to a recognized standard. *Cannon v. Bingman,* 383 S.W.2d 169, 173 (Mo.App.1964); *Komosa v. Monsanto Chemical Co.,* 317 S.W.2d 396, 400 (Mo.1958) and 47 C.J.S. Interest § 19b, p. 31 (1946). The amount of benefits due plaintiff was computed according to the terms of the Disability Program itself, and both parties

agreed that the calculation of benefits was correct. Bank Building will not now be heard to argue that the amount of damages was not readily ascertainable, especially since that amount was derived from the terms of a program formulated by it.

Bank Building's argument that plaintiff's claim was unliquidated is premised on the fact that the Disability Program was discontinued after April 1, 1969, and that there was thus "a need for court determination of the potential rights and liabilities of the parties." If a claim is liquidated, the interposition of a counterclaim, set-off, or defense does not convert the liquidated demand into an unliquidated one or preclude recovery for prejudgment interest even though the counterclaim, set-off or defense places the amount payable in doubt. *Burger v. Wood*, 446 S.W.2d 436, 444 (Mo.App.1969) and Dobbs, Remedies, 167–168 (1973). Prejudgment interest is the measure of damages for failure to pay money when payment is due, even though the obligor refuses payment because he questions legal liability for all or portions of the claim. *Denton Construction Co. v. Missouri State Highway Commission*, 454 S.W.2d 44, 59 (Mo.1970), quoting *Schmidt v. Morival Farms*, 240 S.W.2d 952, 961 (Mo. 1951). As Professor McCormick very succinctly put it, "[I]t is the character of the claim and not of the defense that is determinative of the question whether an amount of money sued for is a 'liquidated sum.'" McCormick, Damages 216 (1935). Accordingly, we hold that the trial court properly awarded plaintiff prejudgment interest on the amount of damages recovered.

We have read the entire record, carefully examined all the exhibits, and considered the authorities relied on by both Bank Building and plaintiff. In accordance with what has been said, we are convinced that the judgment of the trial court was not clearly erroneous and must therefore be affirmed.

Judgment affirmed.

SIMEONE, P. J., and GUNN, J., concur.