Sheila FINK, Plaintiff,

v.

REVCO DISCOUNT DRUG CENTERS, INC., and Sopco, Inc., Defendants.

No. 86–0168–CV–W–6.

United States District Court, W.D. Missouri, W.D.

Aug. 13, 1987.

Donald J. Stites, Michael A. Knepper, Stites, Holliger & Knepper, P.A., Kansas City, Mo., for plaintiff.

Russell W. Baker, Jr., Michael F. Saunders, Spencer, Fane, Britt & Browne, Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

SACHS, District Judge.

### I.

Defendants seek summary judgment on Counts II and III of the state court petition of plaintiff Fink, a former employee. Fink seeks actual and punitive damages for breach of the provisions of an alleged employment contract (Count II) and of an employer's duty of "good faith and fair dealing" (Count III). Defendants' contention is that plaintiff was an "at will" employee whose rights under Missouri law have not been violated. After reviewing the materials and briefing supplied by the parties, the court concludes that there are no material facts in dispute and that Missouri law would favor defendants on Counts II and III, even assuming the employee handbook in question establishes some limitations on employer disciplinary actions and that a factfinder might conclude that plaintiff's immediate supervisor acted unreasonably.

According to uncontested facts, plaintiff was last employed by defendants in July 1984 as a registered pharmacist and assistant manager at a Revco retail store in Kansas City, Missouri. Cindy Brown was manager of the store, and William Turner was area supervisor having authority to terminate plaintiff. Plaintiff had earlier received a document entitled "Store Salaried Employee's Handbook" which is the basis for her claim to a contractual limitation on her employer's right to terminate her. The book contains a notice that it does not constitute an "employment contract" (page 3).[1] The handbook also contains a section entitled "Rules Affecting Your Job" which identifies two types of misconduct. "Group I violations" are described as those for which "one offense may lead to discharge" while "Group II violations" are described as those requiring "strong disciplinary action" and "written warning." "Repetition" of a Group II violation "may result in the employee's discharge." Exh. A to Suggestions in Support of Defendants' Motion for Summary

---

1. It is arguable, and several courts seem to have so ruled, that the single blanket disclaimer destroys the legal effect of the handbook. *Sitek v. Forest City Enterprises, Inc.*, 587 F.Supp. 1381, 1384 (E.D.Mich.1984); *Batchelor v. Sears, Roebuck & Co.*, 574 F.Supp. 1480, 1483 (E.D.Mich. 1983); *Crain v. Burroughs Corp.*, 560 F.Supp. 849, 852–3 (C.D.Cal.1983). Missouri courts would surely strain against holding the handbook to be legally meaningless. It does not take much straining to say that while the handbook may not constitute "an employment contract" it does contain some provisions (not necessarily those in question) that become binding upon reliance. *Enyeart v. Shelter Mutual Insurance Co.*, 693 S.W.2d 120 (Mo.App.1985); *Arie v. Intertherm*, 648 S.W.2d 142 (Mo.App.1983). I do agree with defendants, however, that other internal management statements of policy, not distributed to employees, do not create contractual obligations.

Judgment, page 11 (pages 18 and 19 in handbook). The listing of infractions, however, is "not intended to be all inclusive, but it is typical of some disciplinary infractions and degrees of severity." *Ibid.*, page 10 (page 17 of handbook).

Plaintiff was terminated by Turner for refusing to work on Independence Day. It was her opinion that the store manager, Cindy Brown, should have worked that day. On July 2 the store manager had instructed her to work as a pharmacist on the Fourth. She complained to Turner, who advised the parties should work out their differences. They did not do so.[2] Plaintiff Fink did not report for work. Brown opened and operated the store. The store could not have opened without a pharmacist (Brown, Fink or a substitute). Brown telephoned Fink in the morning to ask why she had failed to report for work, informing her that if she refused to work "you won't be working at the store any more." Fink denied Brown's authority and Brown "hung up on me." Fink Depo., p. 56. At about 4:00 p.m., Turner telephoned Fink and informed her he was terminating her employment as a result of her refusal to work.

Plaintiff contends the discharge was unauthorized in that any violation of rules was a Group II violation, calling for written warning and no discharge without "repetition" of the offense. She argues that the violation cannot be classified as a Group I violation (authorizing immediate termination) because she was not absent for "more than 3 consecutive days," as specified for Group I violation (8), relating to "absence without notice."

The listing of Group I violations does not purport to be all-inclusive. On the contrary, the text shows them to be illustrative or "typical" and further indicates that they are designed for application to less responsible "hourly employees" as well as salaried employees. Exh. A, p. 10 (handbook page 17).

A consideration of the various rules and qualifications suggests that the most analogous or otherwise pertinent rules are the "insubordination" rule in Group II and the Group I rule (2), relating to "intimidating, coercing or interfering with other employees or manager." More than a brief and simple instance of insubordination was here involved, however; whatever her motivation and reasons, Fink engaged in a persistent refusal to comply with her manager's instructions in a manner which effectively *forced* the manager to do the work assigned to plaintiff. Such conduct was "intimidating."

The "three day rule," on which plaintiff places great emphasis, is clearly designed for other purposes. It signifies that an employee can expect to be discharged without being given a second chance if he or she fails to give notice of a three-day absence, most typically an illness. It certainly does not protect an outright refusal to work for two days, for example. Similarly, the Group II violation relating to leaving the premises without permission must fairly be construed as an uncomplicated violation by an ordinary employee. It would not fairly apply to the disappearance of a crucial employee whose presence is necessary to the operation of the store.

■ Given the previously quoted qualifications appearing in the section of the handbook relating to "Rules Affecting Your Job" and a fair application of the rules, it cannot be said that Turner violated the rules by failing to give Fink a second opportunity to demonstrate her willingness to cooperate with her supervisor and the needs of the store operation. Without intruding an outside opinion as to the harshness of the termination, or evaluating the justification Fink offered for her conduct, it cannot be said that Turner violated the

**2.** Another version of the conversation seems to be that Fink told Turner that "unless I heard from him or Cindy I was not planning on working." (Fink Depo. p. 73.) The plaintiff's version is contrary to a finding by the appeals referee under the Missouri Unemployment Compensation System (Exh. B to Plaintiff's Suggestions in Opposition to Defendants' Motion for Summary Judgment). While the recommendation was reversed, the finding was not. This decision would not be affected, however, by acceptance of plaintiff's version of events which shows a very tense situation, with Fink and Brown both issuing ultimatums.

handbook in his discretionary decision to back up the store manager by terminating Fink. Whether this was a good personnel practice is beside the point.

Plaintiff's legal contentions are unsound. She clearly misconstrues the three-day rule. Her request for jury evaluation is unwarranted. In general the interpretation of a writing is for the court in a diversity case, although a jury may be called upon to resolve conflict in extrinsic evidence if such evidence is received to cure an ambiguity. *Cunningham & Co. v. Consolidated Realty Management*, 803 F.2d 840, 842-3 (5th Cir.1986). See the recent judicial interpretation and application of an employee handbook by Judge Bartlett in *Manser v. Missouri Farmers Ass'n., Inc.*, 652 F.Supp. 267, 273-6 (W.D. Mo.1986). Even if state procedures were to be followed, no material difference appears between federal and state practice. *Boswell v. Steel Haulers, Inc.*, 670 S.W.2d 906, 914 (Mo.App.1984); *Enyeart v. Shelter Mut. Ins. Co.*, 693 S.W.2d 120, 124 (Mo.App.1985).

Perhaps the strongest argument for plaintiff would be that she was terminated for insubordination, and that she should have had a second chance under the rules on which she was entitled to rely.[3] This would assume that all insubordination is of like quality, and that it cannot rise to the level of intimidation. I do not believe the employer bound itself to any such a proposition, given the qualifications and other pertinent provisions of the section of the handbook relating to employee rules.

Plaintiff can of course assert that her contention is supported by the general canon of construction that contract language is to be construed against the author. Such a rule of construction is not universally controlling, however. In the present context I think it quite unlikely that the Missouri courts would invoke and use such a rule.[4] While there is a public policy against taking advantage of a party who reasonably relied on his or her reading of an ambiguous writing prepared by the opposing party, I believe the "loopholes" in the handbook are rather plainly stated and I believe the Missouri courts would not wish to discourage the preparation of the disciplinary sections of such handbooks by giving them a construction artificially favorable to employees. On the contrary, public policy would seem to strongly favor the attempt by employers to relieve employees of some of the harsh aspects of the "at will" employment doctrine. Whatever plaintiff may reasonably think of the application of the handbook in her case there can be little doubt that the attempt to regularize personnel practices through the use of such handbooks is commendable. No such codification can be perfectly phrased, and to construe any imperfection in articulation against the employer would unsoundly inhibit the attempt. I am therefore confident the Missouri courts would not rule this aspect of the case in favor of the former employee. *Compare, City of Flat River v. Short*, 694 S.W.2d 767 (Mo. App.1985).

■ Regarding Count III, alleging a violation of the duty of good faith and fair

---

3. This was the view of the appeals referee in the unemployment compensation proceeding, who ordered a disqualification for three weeks. The Commission reversed, finding no misconduct or even culpable negligence. Exh. A, Plaintiff's Suggestions in Opposition. Judge Oliver has soundly ruled, however, that unemployment compensation standards are not binding in wrongful discharge cases. *Nickens v. W.W. Grainger, Inc.*, 645 F.Supp. 569 (W.D.Mo.1986).

4. While the *Enyeart* case, *supra*, contains statements arguably to the contrary, it must be remembered that it dealt with a motion to dismiss. The last full paragraph (693 S.W.2d at 124) shows the analysis would be different when there is a complete record, as on motion

for summary judgment. Where vested monetary entitlements are in issue, it may also be more difficult for an employer to avoid an arguable obligation. *Hinkeldey v. Cities Service Oil Company*, 470 S.W.2d 494 (Mo.1971). As Judge McMillian has written, such a provision is construed like an insurance contract. *Ehrle v. Bank Bldg. & Equip. Corp. of America*, 530 S.W.2d 482, 495 n. 5 (Mo.App.1975). Even in that context, the Missouri courts have indulged employers by relying on nice distinctions between mandatory language and language of a more permissive nature that may realistically escape the attention of employees. *Albertson v. Ralston Purina Co.*, 586 S.W.2d 776, 779 (Mo. App.1979).

dealing, insofar as this is asserted to be a qualification on *all* employment relationships, limiting the harshness of the "at will" doctrine, this is clearly inconsistent with the recent vigorous reaffirmation of the "at will" doctrine. *Dake v. Tuell*, 687 S.W.2d 191 (Mo. banc 1985). It was there ruled that the doctrine could not be avoided by the "cloaking" of claims in the "misty shroud of prima facie tort." *Ibid.* at 192. It would be equally forbidden, surely, to rule that the termination of all at will employment must occur in a manner that a trier of fact would say was consistent with "good faith and fair dealing." The Missouri courts have rejected such a contention. *Neighbors v. Kirksville College of Osteopathic Medicine*, 694 S.W.2d 822 (Mo. App.1985).

It is doubtful that plaintiff makes such an extravagant claim. Instead, she apparently asks that the handbook be construed to give her some form of protected job security, and to overlook the terms of the handbook and impose a general "fair dealing" requirement, to be determined by a trier from consideration of the totality of circumstances. This would strip the employer of all discretion (which implies the right to make mistaken decisions) and is not to be derived from the language of the handbook or supported by any authorities cited by plaintiff.[5]

## II.

■ Defendants also seek summary judgment on Count I, asserting a violation of Missouri's Service Letter Statute, § 290.-140, RSMo. Although a service letter was requested in August 1984, citing the statute to Turner, no such letter was supplied until after suit was filed. Turner states, by affidavit, that he was unaware of the provisions of the statute.

No actual damages are asserted, but plaintiff would be entitled to nominal damages for a violation of the statute and defendants would not be entitled to sum-

mary judgment. The more important issue is whether lack of submissibility of punitive damages is established on the present record. While the question is not easy to answer, in light of a current decision of the Court of Appeals (*Schilligo v. Purolator Courier Corp.*, 824 F.2d 660 (8th Cir.1987), I am not satisfied that defendants have demonstrated a situation exonerating them from punitive damages.

In *Schilligo* the defendant won reversal of an award of $125,000 punitive damages. The Court of Appeals ruled that it was pure conjecture for the jury to suppose that defendant knew of the statute, although plaintiff had referred in writing in general terms to such a statute by saying, "There is a Missouri statute by which you are legally required to furnish me" with service information "within one week...." Defendant contended that it had responded, giving dates of employment and job classification but failing to explain plaintiff's termination. Plaintiff contended he had not received the letter and that in any event it was deficient. The Court of Appeals ruled that there was no proof that defendant was familiar with the statutory requirements and had knowingly failed to comply.

The question was said to be what the jury could reasonably infer about the knowledge of James Rapp, executive vice president of the defendant. He had responsibilities for twenty-three states, only one of which had such a statute. The initial request simply referred to "a Missouri statute" requiring specified information. A second letter, from counsel, mentioned the "Missouri Service Letter Statute," without further citation. The Court of Appeals stated that the attorney's letter "may have given Rapp notice of the statute" but was not the pertinent piece of correspondence. In the present case, the letter did give notice of the exact section number of the statute. While Turner disclaims knowledge of the statute the case is different from *Schilligo*. A decision by

---

5. The general language of one quoted sentence in *Arie v. Intertherm, Inc.*, 648 S.W.2d 142, 150 (Mo.App.1983), will not bear the weight of this contention. As the next sentence shows, it re-

lates to the "terms" of severance and has nothing to do with requiring that there be "sufficient reason" for a termination.

Chief Judge Nangle in St. Louis suggests that the *citation* of the service letter statute in a request letter may be sufficient to create a prima facie showing of knowledge. *Comerio v. Beatrice Foods Co.*, 616 F.Supp. 1423 (E.D.Mo.1985). The affidavit to the contrary would simply create a jury question.

The current statute, quoted in *Jasperson v. Purolator Courier Corp.*, 765 F.2d 736, 738 n. 4 (8th Cir.1985), requires that the request make "specific reference to the statute," as was done here but not in *Schilligo*. The current statute, as quoted, is susceptible of construction that omits any further showing of "knowledge" by the employer as a condition for imposing punitive damages. Some penal statutes do not require *mens rea.* Whether *Schilligo* will be treated as authoritative on this issue (it being unclear whether the former employee urged this reading of the statute) remains as a trial question and perhaps as a matter of trial tactics for plaintiff. It may be that plaintiff will seek enhanced punitive damages by urging that knowledge of the statutory requirements may be inferred, once the statute has been cited to a responsible supervisor.

It is therefore ORDERED that summary judgment in favor of defendants and against plaintiff be entered as to Counts II and III of the petition. It is further

ORDERED that defendants' motion for summary judgment on Count I be DENIED. It is further

ORDERED that Count IV be DISMISSED in accordance with plaintiff's agreement expressed at conference. Count I will be scheduled for trial during the next joint jury trial docket. SO ORDERED.